Nina M. BOWERS, Nell Brown, John Corley, Patricia Creech, Margaret W. Hudson, Janice Hurley, Martha Iles, Betty H. Joiner, Emily M. LaGois, Madie V. McKenney, Brenda J. Nichols, Patty Lynne Paul, Veronica Roberson, Sheila Shiver, Marlene Renee Stanley, Margaret Sue Nembach, Sally Tidwell, Janet Toole, Mary Varnadoe, Leslie C. Villars, Kathleen Chapman, Phyllis Conrad, Barbara Ann Dorough, Martha B. Norris, Denise Barrett, Hazel Lewis, Sybil Middlebrooks, William E. Worthington, Patricia Lynn West and Janie E. Sinard, Plaintiffs,

v.

NORTHERN TELECOM, INC., Defendant.

No. 93–50083/LAC.

United States District Court, N.D. Florida. Panama City Division.

Sept. 25, 1995.

Clifford Higby, Panama City, FL, for plaintiffs.

Peter Jones, Kevin E. O'Brien, Denver, CO, Patrick Farrell, Tallahassee, FL, for defendant.

## ORDER

COLLIER, District Judge.

This cause comes before the court upon Defendant's motion for summary judgment

on general causation. (doc. 110). For the reasons below, the motion is denied.

## I. *Introduction*

Plaintiffs are directory assistance operators ("DAOs") who, at all times relevant to this action, worked for American Telegraph and Telephone Company ("AT & T") in its Panama City and Chipley, Florida offices. As part of their duties, Plaintiffs regularly used the CCI Version II computer keyboard manufactured by Northern Telecom, Inc. ("NTI"). In 1993 Plaintiffs filed this suit alleging the CCI Version II keyboard caused them to suffer a variety of upper-extremity musculoskeletal disorders such as carpal tunnel syndrome, tendinitis, and tenosynovitis (hereinafter referred to collectively as "cumulative trauma disorders" or "CTDs"). Plaintiffs maintain NTI's keyboard is defective in the following three ways: (1) it has an unusually sharp front or leading edge which depresses the soft tissue area over the carpal tunnel; (2) it is too high or too thick, thus causing the user to maintain his or her arms and/or wrists in awkward positions; and (3) it lacks tactile feedback—the mechanism that alerts the user the key has been depressed sufficiently to register the keystroke—thus causing the user to press the keys with greater force.

The complaint alleges counts of negligence, strict liability, breach of implied warranty and breach of express warranty. Under Florida law, each of these causes of action requires, as an essential element, that the alleged defect caused the plaintiffs' injuries. *See Pulte Home Corporation, Inc. v. Ply Gem Industries, Inc.*, 804 F.Supp. 1471, 1486 (M.D.Fla.1992); *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 84 (Fla.1976). In cases such as this, moreover, the causation element can be divided into two components: general causation (the capacity of the product to cause the injury) and specific causation (proof that the product actually caused the injury of which the plaintiffs complain). *See DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 958 (3rd Cir.1990). To prove general causation in this case, Plaintiffs rely entirely on expert witness testimony.

NTI directs this motion for summary judgment to the issue of general causation. NTI argues the opinions of Plaintiffs' experts as to general causation are inadmissible under Rule 702 of the Federal Rules of Evidence and the Supreme Court's recent decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Because Plaintiffs have no admissible evidence on the issue of general causation, NTI argues, summary judgment should be granted in its favor. Before addressing the merits of NTI's motion, the court first sets out the general principles applicable to summary judgment and the admissibility of scientific evidence.

### A. *Standard for Summary Judgment*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Upon proper motion, entry of summary judgment is mandated "... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard is the same as that required for a directed verdict. *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987).

At this juncture, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]he substantive law will identify which facts are material." *Id.* at 248, 106 S.Ct. at 2510. "[A] dispute about a material fact is 'genuine,' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Finally, all evidence and reasonable factual inferences must be viewed against the party seeking summary judgment. *Jeter v. Credit Bureau*, 760 F.2d 1168, 1170 (11th Cir.1985).

B. *Standard for Admissibility of Scientific Evidence*

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. This rule imposes two requirements on the admissibility of expert testimony. First, the expert must be qualified by specialized knowledge, skill, experience, training or education to testify on the subject matter of his or her testimony. *See, e.g., Faircloth v. Lamb–Grays Harbor Co.,* 467 F.2d 685, 694 (5th Cir.1972). Second, the testimony must concern "scientific, technical or other specialized knowledge," which "assist[s] the trier of fact." Fed.R.Evid. 702; *see In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 744 (3rd Cir.1994). In *Daubert,* — U.S. at —, 113 S.Ct. at 2786, the Supreme Court interpreted this language to require that expert testimony meet a threshold standard of reliability and relevance before it is admitted. The Court reasoned an expert's opinion must be based on "methods and procedures of science," rather than on "subjective belief or unsupported speculation." *Id.,* at —, 113 S.Ct. at 2795. Moreover, the expert testimony must "fit" the fact in issue, i.e., there must be a valid scientific connection between the testimony and issue sought to be proven. *Id.,* at —, 113 S.Ct. at 2796.

When faced with a proffer of expert testimony, therefore, the trial judge must act as a "gatekeeper" by assuring the reasoning or methodology underlying the proffered testimony is scientifically valid, and that it properly can be applied to the facts in issue. *Id.* *Daubert* set forth several factors for trial courts to consider in determining whether a proffer of expert testimony meets minimum standards of reliability:

1. whether the expert's hypothesis can be (and has been) tested;

2. whether the expert's theory or technique has been subjected to peer review through publication;

3. the theory's known or potential rate for error; and

4. whether the theory or technique is generally accepted in the relevant scientific community.

*Id.,* at — – —, 113 S.Ct. at 2796–97. The Court emphasized that the inquiry is flexible, and that the overriding principle is to assure that the testimony is scientifically valid. *Id.*

C. *Sufficiency v. Admissibility*

In conducting a *Daubert* inquiry at the summary judgment stage, the trial court must recognize the distinction between determining the sufficiency of the evidence and determining the admissibility of the evidence. Sufficiency of the evidence concerns whether the plaintiffs have produced enough evidence to convince a reasonable juror that their expert's opinion is correct, i.e., that it is more likely than not true that the defendant's product caused the plaintiffs' injuries. *See In re Paoli,* 35 F.3d at 744; *Wells v. Ortho Pharmaceutical Corp.,* 788 F.2d 741, 745 (11th Cir.1986) (discussing standard of proof for causation), *cert. denied,* 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986).

▮▮▮ A *Daubert* inquiry, in contrast, does not focus on whether the expert's opinion is correct; rather, it focuses on whether the opinion is *reliable,* i.e., whether it is based on methods and procedures of science. *In re Paoli,* 35 F.3d at 744. Thus, the *Daubert* Court cautioned that the focus of the inquiry should be on the expert's methodologies and principles and not on the conclusions they generate. — U.S. at —, 113 S.Ct. at 2797. As the Third Circuit recognized, moreover, "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness." *In re Paoli* 35 F.3d at 744. A judge must often recognize that an expert has good grounds for an opinion even though the judge thinks the opinion is incorrect. *Id.* In this regard, the court should not exclude an expert's opinion simply because a flaw exists in the expert's investigative process which leads the court to con-

clude the opinion is incorrect. *Id.* at 745. Exclusion is justified only when the flaws are so great that the expert lacks "good grounds" for the opinion. *Id.*

## II. *Preliminary Matters*

Before determining the admissibility of the expert testimony in this case, the court must resolve two preliminary issues raised by NTI. First, NTI argues the court should not consider the opinions of Plaintiffs' "rebuttal experts" in ruling on this motion because these witnesses were not properly disclosed under the discovery schedule. Second, NTI argues the court should not consider the testimony of Drs. Karl H.E. Kroemer and David A. Thompson because these witnesses are not medical doctors and are therefore not qualified to testify. For the reasons below, the court rejects both contentions.

### A. *"Rebuttal Witnesses"*

On September 16, 1993, the court approved the parties' Stipulated Alternative Discovery Plan. (doc. 33). Under that plan, Plaintiffs were to designate their expert witnesses pursuant to Rule 26 of the Federal Rules of Civil Procedure by January 10, 1994, and NTI was to do the same by February 10, 1994. The plan also allowed Plaintiffs to designate "rebuttal experts" by April 25, 1994.

On January 10, 1994, Plaintiffs endorsed five witnesses to render opinions on general causation: Dr. Karl H.E. Kroemer, Dr. A. Moneim Ramadan, Mr. Gerald Doolittle, Dr. David A. Thompson, and Dr. Naima A.K. Abd Elghany. (doc. 53). As scheduled, NTI endorsed its own experts on February 10, 1994. After deposing the defense experts, Plaintiffs endorsed the following six "rebuttal experts": Dr. David Thompson, Dr. Karl H.E. Kroemer, Mr. Gerald Doolittle, Dr. Naima A.K. Abd Elghany, Dr. James Kornberg, and Dr. Margaret Bleecker. (doc. 101). Four of the "rebuttal experts" had already been disclosed as initial expert witnesses. Thereafter, NTI deposed the two new witnesses, Drs. Kornberg and Bleecker, and redeposed two of the initial witnesses, Drs. Thompson and Elghany.

█ NTI now urges the court to disregard the supplemental deposition testimony of Drs. Thompson and Elghany and the depositions of Drs. Kornberg and Bleecker in ruling on this motion. In support, NTI argues that, in ruling on a summary judgment motion, the court must limit its consideration to evidence Plaintiffs might introduce in their case-in-chief; the court cannot consider "rebuttal" evidence such as these depositions.

The court rejects NTI's argument. Neither Rule 26 nor the parties' Stipulated Discovery Plan defines "rebuttal expert." Merely because the parties labeled this evidence "rebuttal" during the discovery process does not preclude Plaintiffs from using it in their case-in-chief at trial. Indeed, Plaintiffs may call NTI's own witnesses during their case-in-chief if they so desire. Accordingly, the court concludes Plaintiffs' use of these depositions is proper.

█ Moreover, even if it were improper, the court would not exclude the depositions. Trial courts have broad discretion to govern the course of pre-trial matters, *Pacific Indemnity Co. v. Broward County,* 465 F.2d 99 (5th Cir.1972), and the focus of inquiry into noncompliance with pre-trial orders should be (1) prejudice or surprise, (2) ability to cure the prejudice, (3) disruption of the orderly and efficient trial process, and (4) bad faith or wilfulness, *Price v. Seydel,* 961 F.2d 1470, 1474 (9th Cir.1992). In this case, any surprise or prejudice created by the "rebuttal experts" was cured by NTI's subsequent depositions. Discovery ended on schedule, so the trial process was not interrupted. Further, due to the ambiguous use of the term "rebuttal experts" in the pretrial order, the court cannot find Plaintiffs acted in bad faith by interpreting it differently than NTI.

### B. *Qualifications of Drs. Kroemer and Thompson*

█ NTI next argues the court should not consider the deposition testimony of Drs. Kroemer and Thompson because neither expert is a medical doctor; and thus, neither expert is qualified to render an opinion on causation. As discussed, Rule 702 of the Federal Rules of Evidence requires that experts possess qualifications through special-

ized "knowledge, skill, experience, training or education." The trial court has great discretion in determining an expert's qualifications and the scope of his or her testimony. *Evans v. Mathis Funeral Home, Inc.*, 996 F.2d 266, 268 (11th Cir.1993).

In this case, Drs. Thompson and Kroemer each claim to be qualified in the field of "ergonomics," which has been defined as

> the study of the mental and physical capacities of persons in relation to the demands made upon them by various kinds of work.

*New Webster's Dictionary*, 320 (1992). Dr. Thompson holds a Ph.D. in industrial engineering, and is a Professor Emeritus at the Department of Industrial Engineering and Engineering Management of Stanford University. He has taken courses in anatomy, physiology and kinesiology, and he has taught ergonomics to medical students. Dr. Thompson served on the American National Standards Institute ("ANSI") committee on keyboard design, and he has consulted with the California Occupational Safety and Health Administration ("Cal OSHA") and the City of San Francisco concerning safety issues related to keyboard use.

Dr. Kroemer also holds a Ph.D in engineering. Since the 1950s he has researched and published in the field of keyboard design, human engineering of keyboards and computer workstation design. *See, e.g.*, K.H.E. Kroemer, *Cumulative Trauma Disorders: Their Recognition and Ergonomic Measures to Avoid Them*, Applied Ergonomics, December 1989, at 274; K.H.E. Kroemer, *Avoiding Cumulative Trauma Disorders in Shops and Offices*, 53 Am.Indus.Hygiene Ass'n J. 596 (1992). In Germany, Dr. Kroemer served as Director for Ergonomics and of Occupational Medicine for the German Institute of Occupational Safety and Accident Research. In the United States, he served on the first ANSI committee for keyboard design standards.

Initially, the court notes that the testimony of ergonomists has been viewed with caution by some courts, particularly when the ergonomist proposes to render opinions relevant to causation. *See Aparicio v. Norfolk & Western Railway Co.*, 874 F.Supp. 154, 159 (N.D.Ohio 1994). Plaintiffs concede Drs. Kroemer and Thompson are not qualified to diagnose the Plaintiffs' specific injuries. However, Plaintiffs argue these witnesses can identify ergonomic aspects of the CCI Version II keyboard and discuss their association with CTDs in general. The court agrees. Based on their knowledge, experience and training, the court finds these experts qualified to offer such opinions. In this regard, courts around the country have allowed non-physicians to render opinions relevant to causation. *See Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124 (9th Cir. 1994) (toxicologist who was not a medical doctor could testify as to causal link between breast implants and disease from which plaintiff suffered); *Conde v. Velsicol Chem. Corp.*, 804 F.Supp. 972, 986–89 (S.D.Ohio 1992) (even though non-physician toxicologist could not render specific diagnosis, his opinions were helpful in resolving causation issues), *aff'd* 24 F.3d 809 (6th Cir.1994).

The court notes, however, that consideration of these opinions for summary judgment purposes does not preclude later exclusion at trial. The court cannot predict the circumstances and testimony that might arise at that time.

### III. Reliability of Expert Testimony on General Causation

Plaintiffs propose to offer the testimony of seven expert witnesses on the issue of general causation. These experts offer four major opinions: first, the opinion that keyboard use in general can cause CTDs; second, the opinion that the CCI Version II keyboard has an unusually sharp front or leading edge, which can cause CTDs; third, the opinion that the CCI Version II keyboard is too high or too thick, thus causing the user to maintain his or her arms and/or wrists in awkward positions, which, in turn, can cause CTDs; and fourth, the opinion that the CCI Version II keyboard's lack of tactile feedback causes users to depress the keys with greater force, which, in turn, can cause CTDs. The court addresses the reliability of each opinion in turn.

A. *Reliability of Expert Testimony that Keyboard Use in General Can Cause CTDs*

■ Before discussing the specific design defects of the CCI Version II keyboard, each expert opined that keyboard use in general was capable of causing CTDs. NTI argues these opinions are inadmissible under *Daubert,* —— U.S. at ——, 113 S.Ct. at 2786, because they have not been tested, they are not supported by peer reviewed literature, and because the experts' underlying methodologies are flawed.

1. *Testing, Support in the Literature*

NTI first points out that no definitive epidemiological studies have been done to date showing a causal relationship between keyboard use and the development of CTDs. Epidemiology is the field of public health that studies the incidence, distribution and etiology of diseases in the human population. *Reference Manual on Scientific Evidence,* 125 (Federal Judicial Center, 1994) (hereinafter referred to as *"Manual"*). Epidemiological studies are an important factor in determining the admissibility of an expert's opinion on causation. *See Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 313 (5th Cir.1989). At deposition, Drs. Bleecker and Elghany admitted they knew of no definitive epidemiological studies to support their opinions. In the absence of such studies, NTI maintains expert testimony regarding causation is mere speculation and is therefore inadmissible.

The court does not agree. The Eleventh Circuit has recognized that,

> a cause-effect relationship need not be clearly established by ... epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion is sound ... products liability law does not preclude recovery until a "statistically significant" number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies....

*Wells,* 788 F.2d at 745 (*quoting Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529, 1535 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984)). In this case, rather than offering epidemiological studies, Plaintiffs presented a litany of scientific literature, dating from the nineteenth century to the present, supporting the link between CTDs and tasks involving repetition, force, awkward positions and mechanical stress concentrations against soft tissue. *See, e.g.,* Susan R. Stock, *Workplace Ergonomic Factors and the Development of Musculoskeletal Disorders of the Neck and Upper Limbs: A Meta–Analysis,* 19 Am.J.Indus.Med. 87 (1991); Barbara A. Silverstein, Lawrence J. Fine, & Thomas J. Armstrong, *Carpal Tunnel Syndrome: Causes and a Preventative Strategy,* Seminars in Occupational Med., September 1986, at 213; David Ferguson, *An Australian Study of Telegraphist's Cramp,* 28 British J.Indus.Med. 280 (1971); G. Vivian Poore, *Clinical Lectures on Certain Conditions of the Hand and Arm which Interfere with the Performance of Professional Acts, Especially Piano Playing,* British Med.J., Feb. 26, 1887, at 441.

Plaintiffs also refer the court to articles discussing, albeit not definitively proving, the association between keyboard use in particular and CTDs. In 1974, Australian researchers concluded a "strong association" existed between operating keyboards with marked extension of the wrist and recurrent symptoms of incoordination and muscle pain. Joan Duncan & D. Ferguson, *Keyboard Design and Operating Posture,* 17(6) Ergonomics 731, 737 (1974). Likewise, in 1980, German researchers concluded that "constrained postures at VDUs [video display units] as well as at other business machines" can produce "injuries in muscles and tendons." E. Grandjean & E. Vigliani, *Ergonomics of VDUs: Review of Present Knowledge in Ergonomic Aspects of Visual Display Units* 9 (Taylor & Francis Ltd.1980); *see also* Ian A. Marriot & Maria A. Stuchly, *Health Aspects of Work with Visual Display Terminals,* 28(9) J.Occupational Med. 833 (1986).

Similarly, in 1989, the State of California convened an ad hoc advisory panel to review potential video display terminal ("VDT") standards and regulations. The panel included one of Plaintiffs' experts, Dr. David

Thompson, and one of NTI's experts, Dr. David Rempel. The panel agreed on the following points: (1) extended VDT work may be associated with increased rates of musculoskeletal disorders, especially if the workstation is not adjusted properly; (2) various characteristics may exacerbate musculoskeletal discomfort including prolonged periods of fixed body posture and excessive or continuous keying; (3) musculoskeletal discomfort and disorders may be alleviated by workstation adjustability, worker knowledge of correct posture and adjustments and/or task redesign; and (4) factors such as deviated hand position, rapid highly repetitive tasks, constant static loading and force appear to be associated with cumulative trauma disorders. *See Ad Hoc Expert Advisory Committee on Visual Display Terminals: Report to the Department of Industrial Relations, Occupational Safety and Health Standards Board,* (State of California Department of Industrial Relations Division of Occupational Safety and Health, May 1989).[1]

Plaintiffs even cite a recent paper co-authored by their expert Dr. Karl Kroemer and NTI's expert Dr. David Rempel. It states:

> The direct interface between most workers and their computers is the keyboard and the belief that the traditional keyboard may be a major cause of computer related RSI [repetitive strain injuries] is gaining acceptance.... An injury mechanism can be inferred from the few relevant studies.

William Hargreaves, David Rempel, Nachman Halpern, Robert Markison, Karl Kroemer & Jack Litewka, *Toward a More Humane Keyboard,* 1 (*presented at* Association for Computing Machinery Annual Conference on Human Factors in Computing Systems, May 3, 1992). Plaintiffs also presented evidence that the Microsoft Company has recently developed an ergonomically designed split keyboard, and Compaq Computer Company recently put warning labels on its keyboards regarding proper usage. As an indication the view is generally accepted in the medical community, moreover, all the treating physicians in this case support the causal link between keyboard use and CTDs.

Given this evidence, the court concludes the lack of definitive epidemiological testing on this issue does not render the Plaintiffs' expert testimony inadmissible. Rather, the relevant scientific literature supports the expert testimony and weighs in favor of admissibility.

### 2. *Methodologies*

NTI next attacks the individual methodologies used by Drs. Bleecker and Elghany in forming their opinions on general causation. These experts relied on five epidemiological factors for determining causality: (1) biological plausibility, (2) consistency of association, (3) the dose-response relationship, (4) strength of association, and (5) temporal relationship. These factors, among others, are used by researchers to make judgments about causation. *See Manual* at 161. NTI argues Drs. Bleecker and Elghany misapplied each factor.

"Biological plausibility" concerns whether the expert's theory is consistent with current biological knowledge. *Id.* at 163. As discussed, Drs. Bleecker and Elghany admitted they knew of no epidemiological studies establishing a causal link between keyboard use and CTDs. They derived their conclusions on biological plausibility, in part, by extrapolating from studies of CTDs in factory workers with jobs involving high force and high repetition. *See* Barbara A. Silverstein, L.J. Fine & T.J. Armstrong, *Hand Wrist Cumulative Trauma Disorder in Industry,* 43 British J.Indus.Med. 779 (1986). NTI maintains extrapolating data from these high force tasks to low force tasks such as typing at a keyboard is not a scientifically valid methodology. The occupational groups are different; the tasks are different; and the amount of force per task is different. *Cf. Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349 (6th Cir.) (animal studies relating to bendectin cannot be extrapolated to humans), *cert. denied,* — U.S. ——, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992).

---

**1.** However, the panel did not agree whether VDT work was associated with permanent disability, whether CTDs were related to the design of the keyboard, or whether the symptoms were higher among VDT users than other workers performing similar tasks.

"Consistency of association" measures the extent to which the expert's theory is consistent with the findings of other studies. *Manual* at 162. Drs. Bleecker and Elghany testified this factor was satisfied because they had observed "clusters" of CTDs among keyboard users around the country. A "cluster" is a group of injuries occurring at a rate higher than that in the general population. Drs. Bleecker and Elghany claim to have observed the following "clusters" of CTDs associated with keyboards: (1) workers at the *Los Angeles Times* in Los Angeles and *Newsday* in New York, as reported by a National Institute of Occupational Safety and Health ("NIOSH") study, (2) workers at the U.S. West company in Denver, Phoenix and Minneapolis,[2] (3) the Plaintiffs themselves, and (4) other workers in AT & T's Panama City and Chipley, Florida offices as reported by a telephone survey conducted by Plaintiffs' expert Mr. Gerald Doolittle. NTI maintains fatal methodology flaws exist for each cluster because the disease and exposure were not properly defined, and confounding variables and modifiers were not identified and screened out.

The "dose-response" factor measures the extent to which the prevalence of the disease becomes greater as exposure to the suspected cause intensifies. *Manual* at 164. "Strength of association" measures the relative risk between exposure to the suspected cause and the prevalence of the disease in a given population, and "temporal relation" concerns whether exposure to the suspected cause precedes the disease. *Id.* at 161–62. Drs. Bleecker and Elghany testified they observed each of these factors based on the telephone survey conducted by Plaintiffs' expert Mr. Gerald Doolittle, which concluded that 22% of the DAOs who used the CCI

Version II keyboard suffer from some form of CTD. NTI argues the survey is unreliable because the questions were ambiguous, biased and leading. Moreover, Mr. Doolittle did not attempt to find the percentage of people in the general population who suffer from CTDs. In the absence of such a "baseline" or "control" figure for comparison, NTI argues the survey is scientifically useless.

The court recognizes the methodologies of Drs. Bleecker and Elghany are not perfect. However, after careful consideration, the court concludes the flaws in their methodologies are not so great as to render their opinions inadmissible. *See In re Paoli*, 35 F.3d at 744–45 (expert testimony may be admissible even though some methodology flaws exist). As for their extrapolation of data from factory workers, Drs. Bleecker and Elghany both admitted the data could not be compared quantitatively to keyboard use; however, they testified it could be compared qualitatively, and that they factored this consideration into their analysis. Likewise, Plaintiffs admit that neither their cluster analysis nor Mr. Doolittle's telephone survey was perfect, but they point out that few epidemiological studies are perfect. Once again, the experts factored these considerations into their analysis before reaching their conclusions. As for the lack of a baseline for comparison to Mr. Doolittle's survey, Dr. Elghany testified at deposition that, based on her experience and training, she used a baseline of three percent of the general population for comparison.[3] Given these considerations, the court concludes the expert testimony will be helpful to the trier of fact and should be admitted.

Accordingly, based on the factors set forth in *Daubert*, —— U.S. at ——, 113 S.Ct. at 2786, the court concludes Plaintiffs' proposed

**2.** The CTD cluster at the offices of U.S. West also involved the CCI Version II keyboard and also resulted in litigation. The same law firms involved in this case also represented the plaintiffs and defendant in that case.

**3.** To support the reliability of Dr. Elghany's estimate, Plaintiffs refer the court to nineteen scientific sources citing prevalence rates for upper extremity disorders in various groups. The figures range from estimates that .02% of the working population suffers from "repetitive motion disorders", *see* David Rempel, Robert Harrison,

& Scott Barnhart, *Work–Related Cumulative Trauma Disorders of the Upper Extremity*, 267(6) J.Am.Med.Ass'n 838, 839 (1992) (citing United States Bureau of Labor Statistics), to an estimate that 10.8% of workers with jobs involving high force and high repetition suffer from tendinitis or tenosynovitis, *see* Thomas J. Armstrong, Lawrence J. Fine, Steven A. Goldstein, Yair Lifshitz & Barbara A. Silverstein, *Ergonomic Considerations in Hand and Wrist Tendinitis*, 12A(5) J.Hand Surgery 830 (1987).

expert testimony as to the capacity of keyboard use in general to cause CTDs satisfies the minimum threshold standard of reliability. Therefore, this testimony will be admissible at trial pursuant to Rule 702 of the Federal Rules of Evidence. The methodological flaws and other points raised by NTI will go only to the testimony's weight at trial.

B. *Reliability of Expert Testimony that the Sharp Front or Leading Edge of the NTI Keyboard Can Cause CTDs*

■ Plaintiffs' experts also testified that the CCI Version II keyboard's sharp front or leading edge, which forms a 76.84 degree angle, causes CTDs. Dr. Thompson testified that when operators rest their hands or wrists against this sharp front edge, it tends to deform the soft tissue of the palm and wrist and irritate the sensitive area over the carpal tunnel. Over a period of time, this contributes to the formation of CTDs. Drs. Ramadan, Kroemer and Bleecker hold similar opinions.

NTI maintains these opinions are unreliable because they have not been tested and because they lack support in the relevant scientific literature. At deposition, Dr. Bleecker was unable to cite any literature for the proposition that a static load on the palmar crease contributes to CTDs, nor could she cite literature documenting an association between any particular feature of a keyboard and a health outcome in the operator. Likewise, Dr. Ramadan admitted his opinion was not based on scientific literature, but rather, his general observation that the human body is rounded and that "a sharp edge on a rounded contour will cause some disturbance in the physiological mechanisms which are inside the skin and structures underneath it." Absent testing or support in the literature, NTI argues, the court must regard this testimony as mere speculation which will not be helpful to the jury.

The court disagrees. Plaintiffs cite numerous scientific articles identifying repeated pressure on the base of the wrist or palm as a risk factor for CTDs. *See, e.g.,* David Rempel, Radovan Manojlovic, David Levinsohn, Todd Bloom & Leonard Gordon, *The Effect of Wearing a Flexible Wrist Splint in*

*Carpal Tunnel Pressure During Repetitive Hand Activity.*" 19A(1) J. Hand Surgery 106, 109 (1994); Thomas J. Armstrong, Robert G. Radwin, Doan J. Hansen & Kenneth W. Kennedy, *Repetitive Trauma Disorders: Job Evaluation and Design,* 28(3) Human Factors 325 (1986); Thomas J. Armstrong, James A. Foulke, Bradley S. Joseph & Steven A. Goldstein, *Investigation of Cumulative Trauma Disorders in a Poultry Processing Plant,* 43(2) Am.Indus.Hygiene Ass'n J. 103, 104 (1982). Likewise, at deposition, Plaintiffs' expert Dr. Thompson relied upon a case-study in which a secretary developed ulnar nerve injury from repeatedly resting or rocking her wrist over the leading edge of her typewriter for twenty years. *See* S.L. Sauter, L.J. Chapman, S.J. Knutson, & H.A. Anderson, *Case Example of Wrist Trauma in Keyboard Use,* 18(3) Applied Ergonomics 183 (1987).

Plaintiffs also cite several articles and reports recommending computer terminals provide wrist rests to prevent hand and wrist contact with the keyboard's front edge. A 1986 report to the Wisconsin Department of Administration reasoned: "When a wrist or palm is rested on a hard or sharp object, the pressure exerted may increase the opportunity for internal or external trauma to the wrist or palm." Steven L. Sauter, L. John Chapman & Sheri J. Knutson, *Improving VDT Work—Causes and Control of Health Concerns in VDT Use* 29–30 (Department of Preventative Medicine, University of Wisconsin 1986). Likewise, in 1989, a CAL–OSHA report recommended: "[t]he leading edge of the keyboard should not be sharp or hard." David Rempel, *Visual Display Units and Musculoskeletal Disorders—A Review,* printed in Ad Hoc Expert Advisory Committee on Visual Display Terminals: Report to the Department of Industrial Relations, Occupational Safety and Health Standards Board, 56 (State of California Department of Industrial Relations Division of Occupational Safety and Health, May 1989). Similarly, a 1989 special enforcement order arising out of a health hazard evaluation at a California newspaper ordered: "The front edge of the keyboard and the keyboard surface (where the wrist of forearm contact occur) will be

rounded and/or padded." David Rempel, James Lopes, Ramon Davila & Benjamin Davis, *Cumulative Trauma Disorders Among VDT Users at a Newspaper Company*, 6 (California Occupational Safety and Health Administration Department of Industrial Relations, Sept. 13, 1989).

Based on this data, the court concludes Plaintiffs' expert testimony regarding the capacity of the keyboard's leading front edge to cause CTDs meets minimum standards of reliability under *Daubert*, —— U.S. at ——, 113 S.Ct. at 2786. Such testimony will therefore be admissible at trial.

C. *Reliability of Expert Testimony that the Height or Thickness of the NTI Keyboard Can Cause CTDs*

 Plaintiffs' experts also testified that, during keyboard use, elbows should be kept at a ninety degree angle, and the user should keep his or her wrists in a neutral position. Because the CCI Version II keyboard is so thick (71.1 millimeters or 2.8 inches from the base of the keyboard to the home row), the user must maintain elbows and wrists in awkward or extended positions to operate the keyboard. These awkward positions force the wrist, neck and shoulders out of normal position, thus causing CTDs. The user cannot simply raise his or her chair because this would sacrifice legroom. Further, the excessive height combines with the sharp front edge because, after uncomfortably holding their wrists high above the keyboards, users have a tendency to rest their wrists against the sharp front edge, which in turn causes CTDs.

NTI again maintains these opinions are unreliable. First, NTI points to the lack of peer reviewed literature to support the opinions. Neither Drs. Elghany, Bleecker, nor Ramadan could identify definitive epidemiological studies that linked thick keyboards to CTDs. Moreover, NTI argues, these opinions cannot be quantified or tested. While Dr. Elghany believes it is improper to overextend the wrist, she could not state what degree of wrist extension would be harmful. Similarly, Dr. Ramadan could not state what the safe limit of wrist extension or flexion

might be. Thus, NTI argues, these opinions are too unreliable to be admitted.

The court again disagrees. Plaintiffs cite the court to a series of articles indicating that wrist extension, particularly when coupled with finger flexion, increases carpal tunnel pressure and the risk of CTDs. *See* Thomas J. Armstrong, Walter A. Castelli, Gaynor Evans & Rofrigo Diaz–Perez, *Some Histiological Changes on Carpal Tunnel Contents and Their Biomechanical Implications*, 26(3) J.Occupational Med. 197 (1984); Rene Cailliet, *Hand Pain and Impairment*, 113 (4th ed. 1994). Similarly, researchers have reported an increased prevalence of CTDs associated with awkward wrist postures in the use of office equipment. Joan Duncan & D. Ferguson, *Keyboard Operating Posture and Symptoms in Operating*, 17(5) Ergonomics 651 (1974).

In Germany, Plaintiffs argue the problem of thick keyboards has been studied for years, resulting in research recommending that keyboards be no thicker than 30 millimeters from the base of the keyboard to the home row—41.1 millimeters less than the NTI keyboard. *See* A. Cakir, D.J. Hart & T.F.M. Stewart, *Video Display Terminals*, 126 (1980). According to Plaintiffs, the German government subsequently passed that standard into law.

Plaintiffs also point the court to a current draft of the proposed ANSI standard for keyboard design. The draft seems to accept and incorporate most of the opinions expressed by Plaintiffs' experts:

Observation of keyboard operators show that hand ulnar deviations and extensions are common (Grandjean, 1985, Patkin, 1988, Aaras, 1988). Research has shown that hand extensions and flexions beyond 15 degrees, and ulnar and radial deviation beyond 10 degrees, can increase histological pressure inside the carpal tunnel of the wrists, which leads to decreased performance and comfort (Smith 1993, Grandjean, 1985) and is associated with carpal tunnel syndrome (Patkin, 1988, Rempel 1991, Armstrong 1979). Many of the requirements of this standard are intended to alleviate excessive hand deviations.

. . . . .

### 6.4 Biomechanics

There is high correlation between hand and body postures and repetitive strain injuries (RSIs) also known as cumulative trauma disorders (CTDs) (Armstrong; Patkin; Rempel).

6.4.1 A properly designed keyboard, in combination with appropriately designed and adjusted supporting surface, chair and other furniture elements, will allow a user to adopt and maintain neutral arm and finger positions and thus minimize extreme hand and body postures associated with RSIs (CTDs).

. . . . .

### 5.15 Keyboard Height

The home row shall not exceed 30 mm in height above the support surface.

Discussion: This requirement is based on research which shows that hand extension beyond 15 degrees is biomechanically inappropriate.

*ANSI/HFS 100 Committee Draft—American National Standards for Human Factors Engineering of Visual Display Terminal Workstations,* 1, 15, 31 (published by Human Factors and Ergonomics Society, Oct. 28, 1993).[4]

Despite the lack of epidemiological testing, therefore, the court concludes Plaintiffs' proposed expert testimony on this point is sufficiently reliable to gain admission under *Daubert,* 113 S.Ct. at 2786. Once again, the arguments raised herein by NTI will go only to the weight the testimony is to be given at trial.

D. *Reliability of Expert Testimony that Lack of Tactile Feedback Can Cause CTDs*

▮ Lastly, Plaintiffs experts testified that lack of tactile feedback in the CCI Version II keyboard contributes to CTDs. Tactile or "snap action" feedback alerts the user the key has been depressed sufficiently to register the keystroke. In the absence of tactile feedback, Plaintiffs' experts testified the user depresses the key until it "bottoms out," thus causing "micro traumas," or ex-

tremely small shocks, to the finger tips. The absence of tactile feedback also causes the user to depress the keys with greater force, which contributes to CTDs.

NTI argues the opinions of Drs. Bleecker and Elghany are inadmissible on this point for two reasons. First, at deposition, neither expert could cite any literature or studies indicating keyboards that require more force to depress the keys cause CTDs. Second, neither expert could cite any literature or studies suggesting that the absence of tactile feedback causes the user to impart more force to the keys. In this regard, neither witness had any data regarding how much force is required to depress the keys of *any* keyboard. In fact, in a study conducted by NTI's expert Dr. David Rempel, the authors concluded tactile feedback does *not* affect the degree of force imparted by users to the keys. *See* Thomas J. Armstrong, James A. Foulke, Bernard J. Martin, Jack Gerson & David Rempel, *Investigation of Applied Forces in Alphanumeric Keyboard Work,* 55(1) J.Am.Indus.Hygiene Ass'n 30 (1994). For these reasons, NTI argues the opinions of Drs. Bleecker and Elghany are not reliable enough to be admitted.

Once again, the court disagrees. At deposition, Drs. Bleecker and Elghany admitted no definitive epidemiological studies exist to prove greater keyboard force causes CTDs. Instead, they extrapolated from studies of factory workers and other high force jobs to conclude that any increase in force increases the likelihood of CTDs. In support, Plaintiffs also point to the conclusions of other experts that "[f]orce is considered a significant risk factor for these injuries (i.e. repetitive strain injuries due to office work) and reducing the keyswitch force of activation (light touch keyboard) has been shown to reduce force that typists apply." *See* William Hargreaves, David Rempel, Nachman Halpern, Robert Markison, Karl Kroemer & Jack Litewka, *Toward a More Humane Keyboard,* 1 (*presented at* Association for Computing Machinery Annual Conference on Hu-

---

4. As of the date of this Order, this draft is still under review by ANSI. However, the court still regards it as relevant to the reliability of Plaintiffs' experts' testimony on general causation.

man Factors in Computing Systems, May 3, 1992).

As for NTI's second contention, Plaintiffs acknowledge a debate exists in the scientific community whether lack of tactile feedback causes the user to impart more force to the keys. NTI's expert Dr. Rempel published a study indicating it does not. *See* Thomas J. Armstrong, James A. Foulke, Bernard J. Martin, Jack Gerson & David Rempel, *Investigation of Applied Forces in Alphanumeric Keyboard Work*, 55(1) J.Am.Indus.Hygiene Ass'n 30 (1994). Plaintiffs' expert Dr. Thompson published a study, using the raw data collected from the Rempel article, reaching the opposite conclusion. David A. Thompson, *Analysis of the Effect of Keyboard Tactile Feedback on Typing Force*," reprinted in F. Aghazadeh, *Advances in Ind. Ergonomics & Safety VI* (Taylor & Francis 1994). Moreover, at deposition, NTI's own expert Dr. Sind–Prunier testified that,

> [t]actile feedback typically appears to reduce applied forces ... Users must have some indication as to when the switch is activated so that they may discontinue the application of force.

Plaintiffs also point to the draft of the proposed ANSI standard, which makes tactile feedback mandatory. The standard states:

> Elimination of either the breakaway force reduction or the secondary force increase for cushioning may result in slower keying activity, higher error rates, and *increased operator fatigue.*

*ANSI/HFS 100 Committee Draft—American National Standards for Human Factors Engineering of Visual Display Terminal Workstations*, 30–31 (published by Human Factors and Ergonomics Society, Oct. 28, 1993) (emphasis added).

Based on this data the court again concludes the balance of *Daubert* factors weighs in favor of admissibility. To the extent NTI seeks to attack these opinions, such attack will go to weight only.

### IV. *Conclusion*

For the foregoing reasons, the court concludes Plaintiffs' proposed expert testimony on general causation satisfies the mini-

mum standards of reliability based on the factors set forth in *Daubert,* 113 S.Ct. at 2786. Accordingly, such evidence will be admissible at trial pursuant to Rule 702 of the Federal Rules of Evidence. The court further concludes Plaintiffs' proposed testimony is sufficient to raise a genuine issue of fact on the issue of general causation. Because a genuine issue of fact exists on this point, summary judgment must be denied.

Accordingly, it is hereby **ORDERED** that NTI's motion for summary judgment as to general causation (doc. 110) is **DENIED.** This case shall proceed to trial.

**ORDERED.**