**Evetta DENNIS, et al., Plaintiffs,**

v.

**PERTEC COMPUTER CORPORATION, et al., Defendants.**

**Civil Action No. 90–5073 (CSF).**

United States District Court, D. New Jersey.

June 6, 1996.

Wilentz, Goldman & Spitzer, P.C. by Kevin M. Berry, Woodbridge, NJ, for Plaintiffs.

Porzio, Bromberg & Newman, P.C. by Steven P. Benenson, Brian T. Flanagan, and Jonathan R. Kuhlman, Morristown, NJ, and Hanlon, Lavigne, Topchik, P.C. by Lawrence N. Lavigne, Edison, NJ, for Defendants.

## OPINION

**CLARKSON S. FISHER**, District Judge.

In this consolidated action filed under the New Jersey Products Liability Act 2A:58C-1 *et seq.*, defendants Unisys Corporation and Pertec Computer Corporation petition this court to scrutinize the reliability of expert testimony proffered by plaintiffs Evetta Dennis, Thomas Dennis, Patricia Williams, Darlene Smith, Ruth Ann Cast, Estella Vick, Jacqueline Murphy, Yolanda Johnson, Claudia Siegel, Verlee Siegel, Iris Simmons, David Simmons and Sandra Embry, to demonstrate the existence of a causal link between the CMC–108 keyboard and plaintiffs' upper extremity disorders. Defendants wage a vigorous assault on the array of experts deployed by plaintiffs. Defendants attack the adequacy of the experts' credentials and the methodology underlying their conclusions.

Plaintiffs try to stave off the offensive by marshaling a defense comprised of policy, procedure and substance. In an attempt to avoid a direct confrontation with defendant, plaintiffs initially seek refuge in the "liberal thrust" of the Federal Rules of Evidence. To explain briefly, plaintiffs argue that their proffer satisfies the requirements embodied in Rule 702 and that the jury should make the final determination regarding the weight of their submission. Additionally, plaintiffs contend that defendants failed to meet their burden under the *Daubert* framework. In the event a direct confrontation is unavoidable, plaintiffs offer a defense of the experts' opinions.

Plaintiffs are data entry operators and former data entry operators for the State of New Jersey. As data entry operators, plaintiffs were required to manually manipulate the CMC–108 keyboard for approximately seven hours a day. Plaintiffs have different medical histories; however, they are all approximately the same age and have worked for the State as data entry operators for approximately the same amount of time.

Plaintiffs began experiencing pain in their upper extremities. Each individual plaintiff filed a complaint in state court advancing the legal theories of failure to warn and design

defect. The cases were subsequently removed and consolidated.

To recover under New Jersey's Products Liability Act, plaintiffs must establish causation. In other words, plaintiffs must demonstrate the existence of the necessary legal relationship between their injuries and the design of the CMC–108 keyboard or defendants' failure to warn of the dangerous propensities of the keyboard. In an attempt to satisfy its burden of proof, plaintiffs have solicited the opinion of four experts. Dr. Karl Kroemer, D.Eng., and Dr. David Thompson, Ph.D. have been solicited to render an opinion regarding the relationship between the CMC–108 keyboard and upper extremity disorders. Dr. Craig Rosenberg, M.D., P.C. has been employed by plaintiffs to link the opinions of Kromer and Thompson to plaintiffs' specific injuries. Finally, Dr. Sam Glucksberg, Ph.D. has been retained to render an opinion regarding the sufficiency of warnings. Before turning to the substantive discussion of their opinions, the court will provide a brief profile of each individual.

Dr. Karl Kromer, D.Eng., is plaintiffs' first expert. Dr. Kromer is an ergonomist who received a doctoral degree in mechanical engineering in West Germany in the late 1950's. Dr. Kromer has worked with various national organizations and also formulated the first keyboard standards in the United States.

Based on his experience and review of the literature, Dr. Kromer is of the opinion that keystroking has been identified as a significant factor in the development of upper extremity disease in the general population. In short, Dr. Kromer declares that scientists have documented the causal relationship between keystroking and upper extremity disorders in humans as early as the 1920's. Additionally, plaintiffs asked Dr. Kromer to discuss the specific design deficiencies in the CMC–108 keyboard.

The second expert offered by plaintiffs is Dr. David Thompson, Ph.D. Dr. Thompson receive a doctoral degree in industrial engineering from Stanford University in 1961. He has an outstanding academic record and has been recognized by the scientific commu-

nity on many occasions. He is currently a Certified Professional Ergonomist and a Professor Emeritus in the Department of Industrial Engineering and Management at Stanford.

Plaintiffs asked Dr. Thompson to render an opinion regarding the design defects of the CMC–108 keyboard. In addition, plaintiffs asked Dr. Thompson to discuss the relationship between keystroking and upper extremity disorders afflicting the general population. After a review of the literature and the keyboard, Dr. Thompson concludes that poor key placement, lack of tactile feedback, excessive keying forces, and excessive board thickness rendered the CMC–108 keyboard defective. In addition, Dr. Thompson informs that scientists declared that the CMC–108 design was a significant cause of upper extremity disorders more than a decade ago.

Plaintiffs also submit the opinion of Dr. Craig Rosenberg, M.D., P.C. to establish that the CMC–108 keyboard caused their particular injuries. Dr. Craig Rosenberg is a medical doctor educated at the Autonomous University of Guadalajara, School of Medicine, in Mexico. In 1985, Dr. Rosenberg returned to United States and completed his residency at New York University Medical Center. Dr. Rosenberg is board certified by the American Board of Physical and Rehabilitative Medicine and the American Board of Disability Consultants.

After conducting an examination of plaintiffs, Dr. Rosenberg states that there is a direct and causal relationship between keystroking and plaintiffs' injuries. Dr. Rosenberg acknowledged the existence of numerous conditions that could have caused or contributed to plaintiffs' conditions; however, in his medical opinion, keystroking was a substantial contributing factor to plaintiffs' injuries. Dr. Rosenberg continued his diagnosis with a discussion of the defects in the CMC–108 which he believed attributed to plaintiffs' condition.

The last expert is Dr. Sam Glucksberg, Ph.D. Dr. Glucksberg is a professor of psychology at Princeton University. He has devoted a large portion of his academic career to the study language and communication.

Dr. Glucksberg states that defendants could have reduced plaintiffs' risk of repetitive stress injury by providing adequate and timely warnings regarding the safe use of the keyboard. Dr. Glucksberg continues by discussing the specific warnings that could have obviated any latent problems.

When confronted with a proffer of scientific evidence, district courts are required to resort to the Federal Rules of Evidence to consider the "preliminary questions" underlying the admission of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993) (citing Fed.R.Evid. 104(a)). The court's initial inquiry concerns the qualifications of the individual offering the opinion. *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741 (3rd Cir.1994). If the court finds that the individual qualifies as an expert under the liberal standard in this jurisdiction, *Holbrook v. Lykes Bros. Steamship Co.*, 80 F.3d 777, 784 (3rd Cir.1996), *In re Paoli*, 35 F.3d at 741, the court must then scrutinize the expert's opinion to ensure that the opinion qualifies as "scientific knowledge" and will "assist the trier of fact." *Daubert*, 509 U.S. at 591, 113 S.Ct. at 2796 (citing Fed.R.Evid. 702). To that end, only expert opinions that are constructed with a sound scientific methodology and provide the requisite nexus to the disputed issue will qualify as helpful. *Daubert*, at 590, 113 S.Ct. at 2795.

The Supreme Court and the Third Circuit Court of Appeals have prescribed a litany of factors to assist in that determination. Under that framework, the district court must consider (1) whether the theory or technique has been tested, (2) whether the theory or technique has been subjected to peer review, (3) the known or potential rate of error of the particular scientific technique, (4) the existence and maintenance of standards controlling the technique's operation, (5) the "general acceptance" of the theory or technique, *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2790, (6) the relationship of the technique to methods which have been established as reliable, (7) the qualifications of the

expert based on the methodology and (8) the non judicial uses to which the method has been utilized. *In re Paoli*, 35 F.3d at 742 n. 8.

That legal framework represents a shift from the common law rule followed in many jurisdictions. *Daubert*, at 584, 113 S.Ct. at 2792 (citations omitted). In rejecting the *Frye* test, the Supreme Court declined to adhere to the traditional protocol of "nose-counting" and, instead, opted to broaden the parameters of admissible scientific evidence to include novel opinions. Indeed, the *Daubert* approach signals a change in the traditional balance struck between the competing interests of the law and science. *Daubert*, 509 U.S. at 596–97, 113 S.Ct. at 2798–99.

Federal courts are now actively involved in the scientific process. No longer will a federal court be permitted to wait for the magical moment when a scientific principle or discovery "crosses the line between the experimental and demonstrable stages." *Daubert*, 509 U.S. at 585–86, 113 S.Ct. at 2792–93. Indeed, *Daubert* requires a district judge to enter this "twilight zone," *id.*, and wade through the scientific evidence to determine the reliability of a novel scientific opinion.

The district judge does not travel alone. Indeed, the district judge functions merely as a gatekeeper; it is the party seeking to admit expert evidence that must demonstrate to the court by a preponderance of the proof that the opinion is reliable. *In re Paoli*, 35 F.3d at 743–44. That standard, according to the Third Circuit, requires more than a *prima facie* showing of reliability.

■ In light of that legal framework, the court will scrutinize the first of plaintiffs' general causation experts, Dr. Kroemer. The court need not engage in a lengthy debate regarding Dr. Kromer's credentials or qualifications as an expert. As previously noted, Dr. Kroemer utilized his engineering degree in the field of ergonomics. In addition, plaintiffs point out that Dr. Kroemer has engaged in extensive research in the area and has served on many committees. The court finds that plaintiffs have met their burden under Rule 104(a) and determines that Dr. Kroemer is qualified to testify regarding the relationship between the biome-

chanics of keystroking and upper extremity disorders. Qualifying as an expert, however, is merely the first hurdle under the *Daubert* framework. To present the evidence to the jury, plaintiffs must demonstrate that Dr. Kroemer's scientific theory or technique is reliable.

In challenging the reliability of Kroemer's opinion, defendants direct the court to two general areas. First, defendants criticize the manner in which Dr. Kroemer conducted his scientific research. Second, defendants point to Dr. Kroemer's inability to support his opinion with scientific studies.

To explain, defendants' challenge to Dr. Kroemer's research technique and methodology stems from his failure to include three NIOSH reports which, according to defendants, are "critical" to any analysis regarding upper extremity disorders. In an attempt to uncover the reasoning underlying Kroemer's decision to exclude those studies from his report, defendants ask Dr. Kroemer a series of questions intended to elucidate the criteria he utilized to select studies to include in his report.

For example, defendants asked Kroemer whether he made any comparison between workplaces, work environments and workstation designs in each study. Defendants then inquired into whether Kroemer compared the personal and non occupational activities of each subject of the study. Lastly, defendants asked Kroemer if he considered the keyboard tasks of the subjects of each study.

Kroemer responded by stating that his protocol for comparing the results of the various studies was "not defined." Indeed, with regard to certain considerations, Kroemer testifies that "[certain factors] were probably in the back of my mind." (Kroemer Dep. at 165).

Defendants also urge that Kroemer's opinion is unreliable because he could not cite to a single study which concludes specifically that keyboard design causes upper extremity disorders. Under the *Daubert* approach, the thrust of defendants' argument has limited value; however, that argument seems to

stem from Kroemer's failure to enunciate his research technique. Indeed, in the absence of any discussion regarding the criteria underlying the decision to include a report in the report, defendants only option is to question the sufficiency of authority supporting the opinion and hope Kroemer attempts to justify his conclusion.

Realizing the deficiencies in Kromer's report, plaintiffs do not attempt to defend his research technique. Instead, they attempt to shift the burden to defendants by arguing that defendants "have provided no evidence . . . [from] qualified persons that Dr. Kroemer's methodologies were substandard." (Pl. Brief at 40). Plaintiffs' argument does not persuade the court. Under Rule 104(a), it is the proponent of the evidence that must demonstrate the reliability of the evidence. In the absence of such a showing, plaintiffs can only shield themselves with Dr. Kroemer's resume.

Kroemer's credentials alone are insufficient to protect his opinion from the assault waged by defendants and scrutiny under *Daubert*. Although the *Daubert* approach embraces novel scientific opinions, those opinions must be "based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Paoli*, 35 F.3d at 742. Simply stated, Kromer's unrecorded mental methodology amounts to nothing more than unsupported speculation.

■ Defendants next challenge is directed to Dr. Thompson. Defendants challenge his credentials and the methodology Dr. Thompson utilized in arriving at his opinion. The court need not devote a lot of energy to support its finding that Dr. Thompson qualifies as an expert in this matter. *See Holbrook, supra.* As discussed previously, Dr. Thompson is a certified professional ergonomist and a professor at Stanford. In addition, Dr. Thompson has devoted a large portion of his professional life to the study of human factors. However, before Dr. Thompson can testify, the court must once again determine if his opinion is reliable.

Turning to the substance of the expert report, Dr. Thompson opines that scientists recognized more than a decade ago that "the [CMC–108] keyboard design was likely to produce cumulative repetitive motion trauma for a significant number of its users." (Berry Cert. Ex. Q at 13). To arrive at that conclusion, Dr. Thompson reviewed the relevant scientific literature, inspected the CMC keyboard at his office, and sent a sample of the keyboard to the Ergonomics laboratory at the University of California.

To demonstrate the unreliability of Thompson's opinion, defendants attack the testing techniques utilized by both Thompson and the University laboratory and the scientific literature supporting Thompson's conclusion. With regard to the scientific techniques, defendants point out that Dr. Thompson did not engage in any preliminary research to determine whether the keyboard he tested was representative of the keyboard that defendants manufactured in the 1970's. Indeed, Dr. Thompson, according to defendants, never inquired into the maintenance or repair of the keyboard to determine if that particular keyboard was an anomaly. In addition, defendants indicate that Dr. Thompson never removed the cover of the keyboard to inspect the keys.

Defendants also direct the court to Dr. Thompson's inability to identify the individuals who conducted the testing at the university, inability to identify the type of equipment utilized by those individuals and inability to identify the protocol employed by the unidentified individuals. Defendants contend that in the absence of a reliable baseline Dr. Thompson could not properly have evaluated the relationship between the keyboard and upper-extremity disorders.

Instead of confronting defendants with evidence demonstrating the reliability of the testing techniques, plaintiffs once again contend that defendants' "criticisms [are] wholly unsupported by any evidence from a person qualified to give such evidence." (Pl. Brief at 44). As discussed previously, plaintiffs' argument does not hold up.

Plaintiffs do attempt to justify the merits of Thompson's opinion by indicating that "four published articles [support Thompson's conclusion] that excessive [key] force . . . *may* result in injury to the user." (Pl. Brief

at 43) (emphasis added). Both parties dispute the underlying premise of those studies; however, even assuming Thompson interpreted those studies correctly, his opinion has simply not gained general acceptance.

That finding is reinforced by various pieces of correspondence written by Dr. Thompson. Additionally, it may explain Thompson's decision to restrict the use of the report to the judicial forum rather than subject his opinion to peer review.

In light of those findings and plaintiffs failure to meet their burden, this court is compelled to exclude Thompson's testimony.

■ At this juncture, the court will turn to plaintiffs' warnings expert, Dr. Sam Glucksberg, Ph.D. Defendants' position with regard to Glucksberg is simply: "the foundation for Dr. Glucksberg's opinion is illusory ... [because his] entire testimony rests on the opinions of ... Drs. Kroemer and Thompson." (Def. Brief at 46). Plaintiffs do not dispute that contention but, rather, offer a substantive discussion of the duty to warn under New Jersey law. Indeed, even at oral argument, plaintiffs failed to address defendants' argument. In light of the court's previous findings and the absence of any discussion demonstrating the independent reliability of Glucksberg's report, the court is compelled to exclude Dr. Glucksberg's testimony.

■ The last expert offer by plaintiffs is Dr. Craig Rosenberg. As a preliminary matter, the court finds that Dr. Rosenberg qualifies as an expert under Rule 702. Dr. Rosenberg is a medical doctor and practices in the field of physical medicine. This court is confident that the doctor is qualified to identify the existence of upper-extremity disorders such as carpal tunnel syndrome.

Dr. Rosenberg is not plaintiffs' treating physician; however, after conducting an examination of all eleven individuals, Dr. Rosenberg concluded that there is a "direct and causal relationship" between each plaintiffs' injuries and her keystroking activities at the CMC–108 keyboard. To arrive at that conclusion, Dr. Rosenberg considered the physical examination, work history, individual medical history, family history and typing style.

Defendants contend that that methodology is unreliable. More specifically, defendants argue that the *Daubert* approach required Dr. Rosenberg to conduct additional testing to rule out other potential causes of plaintiffs' injuries and to support his opinion with epidemiological studies.

With regard to their first assertion, defendants must satisfy a three-part test. First, defendants must show that the doctor failed to employ a sufficient number of diagnostic techniques to rule out alternative causes of the condition. Second, defendants must show that there exists a likely secondary cause. Third, defendants must show that the doctor failed to offer a reasonable explanation to support the belief that the defendants' actions were a substantial factor in perpetuating plaintiffs' condition. *Paoli*, 35 F.3d at 760.

The court need not engage in extended discussion with regard to defendants' challenge to Rosenberg's testing techniques. The court notes that Dr. Rosenberg did not perform every test which defendants contend is essential to a proper diagnosis; however, the doctor did employ a sufficient number of testing techniques to support a finding of reliability. Additionally, defendants did not satisfy the second element. Defendants did offer a panoply of possible alternatives, but failed to demonstrate the existence of a secondary cause that was "likely" to cause plaintiff's injuries. Accordingly, the court finds that Rosenberg utilized reliable techniques to make his diagnosis.

Defendants also urge the court to exclude Dr. Rosenberg because his diagnosis "is wholly inadequate to determine causation in a legal sense ... because differential diagnosis merely generates a hypothesis for determining treatment." (Def. Reply at 10). Defendants may be correct; however, the court is not reviewing Rosenberg's opinion to determine whether plaintiffs establish causation by a preponderance of the evidence. In this context, the court is reviewing plaintiffs' submission to ensure that they have demonstrated reliability by a preponderance of the proof.

In sum, defendants' motion to exclude plaintiffs' experts is granted in part and denied in part. The court will exclude the testimony of Dr. Kroemer, Dr. Thompson and Dr. Glucksberg. Dr. Rosenberg, on the other hand, will be permitted to present his opinion.