Joanne **STASIOR**, Plaintiff,

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, d/b/a Amtrak, Defendant.**

No. 95 C 1958.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 28, 1998.

Louis C. Cairo, Edward W. Pirok, Goldberg, Weisman and Cairo, Ltd., Chicago, IL, for Plaintiff.

Thomas J. Healey, David R. Schmidt, Lord, Bissell & Brook, Peter F. Higgins, Attorney at Law, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

Plaintiff Joanne Stasior filed this action on March 30, 1995, under the Federal Employers Liability Act, 45 U.S.C. §§ 51–60 ("FELA") seeking damages for carpal tunnel syndrome of the right hand and tendonitis and tenosynovitis of both hands allegedly sustained during the course of her employment with Defendant National Railroad Passenger Corporation. Defendant now moves the court to bar the expert testimony of Gary Herrin and Michael Shinnick under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Defendant also moves the court to enter summary judgment on its behalf under Rule 56 of the Federal Rules of Civil Procedure on the grounds that Stasior cannot produce any admissible evidence to support her FELA claim. For reasons set forth below, the court grants defendant's motion to bar Stasior's expert testimony under Rule 702 and *Daubert,* and thereby grants defendant's motion for summary judgment.

### Background

Plaintiff Joanne Stasior ("Stasior") began working for Defendant National Railroad Passenger Corporation ("Amtrak") as a reservation sales agent at Amtrak's Chicago facility on April 4, 1977. (Stasior Dep. at 18.) Except for medical leave for unrelated back surgery in 1981, Stasior worked for Amtrak continuously from April 1977 until May 1992. (Stasior Dep. at 49–50.) Around August 1991, while working in the Reservation Sales Office ("RSO"), Stasior began to experience tingling in her hands and sharp pains in her wrists. (Stasior Dep. at 79.) Because of these symptoms, Stasior purchased wrist splints for both hands in August 1991. (Stasior Dep. at 79.)

On May 1, 1992, having lost all tolerance of pain, Stasior went to Loyola Hospital Emergency Room. After learning of her occupation, the emergency room doctor told Stasior that he believed the diagnosis was carpal tunnel syndrome ("CTS"). (Stasior Dep. at 84–85.) A third year resident, while examining Stasior, also rendered a diagnosis of tendonitis. (Stasior Dep. at 90.) In October 1992, Stasior had surgery on her wrists performed by another doctor, Dr. Gerald Harris, who also had diagnosed her condition as CTS. (Stasior Dep. at 89–90.)

Because Stasior's pain did not recede after the surgery, Dr. Harris reviewed with Stasior in 1994 how she should modify her work station so as to alleviate her pain. (Harris Dep. at 36.) This advice included having a built-in rest period from typing of 15 minutes every hour. (Harris Dep. at 37.) On Stasior's last visit to Dr. Harris,[1] he noted that she still had severe pain from CTS in both wrists, that she could only work three to four days a week because of this pain, that she used a computer all day when she was at work, and that she was not getting the required hourly rest breaks. (Harris Dep. at 73.)

On March 30, 1995, Stasior filed this action under FELA alleging that in the course of performing her work as a reservation sales clerk with equipment provided by Amtrak, she sustained CTS of the right hand, including weakness, numbness, and damage to the nerves in the right hand; and tendonitis and tenosynovitis of both hands. (Stasior's Complaint ¶ 5.) Stasior alleges that her injuries resulted in whole or in part from Amtrak's negligent failure to provide her with reasonably safe working conditions. (Stasior's Complaint ¶ 6.) Stasior seeks damages in an amount in excess of $50,000. (Stasior's Complaint ¶ 7.)

On February 9, 1996, Amtrak filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, arguing that Stasior's claim was barred by the

---

**1.** It is unclear from the record exactly when Stasior's last visit to Dr. Harris took place.

applicable statute of limitations. On September 19, 1996, this court denied Amtrak's motion. *Stasior v. National Railroad Passenger Corporation,* No. 95 C 1958, 1996 WL 568796 (N.D.Ill. September 27, 1996).

In support of its claim that it did not cause Stasior's injuries, Amtrak provides the expert testimony of professional ergonomist David T. Ridyard. Ridyard compiled a report which quantitatively analyzes the ergonomic conditions at Stasior's work station. Ridyard states that Stasior's work regimen as a reservation sales agent involves neutral wrist posture, low frequency keystrokes, and low force of keystrokes. (Ridyard Report at 2–5.) Ridyard concludes "that there are no potential carpal tunnel syndrome and other upper extremity cumulative trauma disorder risk factors at the Chicago Amtrak facility." (Ridyard Report at 6.) Amtrak also cites a scientific study which finds that while CTS is strongly associated with high force-high repetitive jobs and to a lesser extent with low force-high repetitive jobs and high force-low repetitive jobs, CTS is not associated at all with low force-low repetitive jobs. Furthermore, the study stated that often cited awkward postures are not found to be strong predictors of CTS. Barbara A. Silverstein, Ph .D. et al. *Occupational Factors and Carpal Tunnel Syndrome.* 11 American Journal of Industrial Medicine 343, 353 (1987).

On January 16, 1998, Stasior moved the court to bar Ridyard's testimony. On January 21, 1998, this court denied Stasior's motion.

To support the causation and foreseeability elements of her FELA claim, Stasior has provided the expert testimony of two professional ergonomists, Gary D. Herrin, Ph.D. and Michael Shinnick, Ph.D.

**A. *Gary D. Herrin, Ph.D.***

Dr. Herrin has a Ph.D. in industrial and systems engineering, and he is a professor of industrial and operations engineering at the University of Michigan. (Herrin Dep. at 129.) Throughout his career at the University of Michigan, Dr. Herrin participated in 35 research projects tracking a variety of occupational risk factors as they relate to injury. (Herrin Dep. at 59–62.) Moreover, while Dr. Herrin is not an epidemiologist, he teaches epidemiology, and he has served as a statistician for approximately four epidemiological studies specifically investigating cumulative trauma disorders. (Herrin Dep. at 59–62.) One of these studies found an association between occupational risk factors and CTS. (Herrin Dep. at 65.) In his consulting and teaching activities both inside and outside the University of Michigan, Dr. Herrin has specifically addressed occupational hand use and CTS. (Herrin Dep. at 85.) As a professor of industrial and operations engineering, Dr. Herrin has gained roughly 25 years of experience as an ergonomist. (Herrin Dep. at 130 .) Dr. Herrin used to be the director for the Center for Ergonomics at the University of Michigan. (Herrin Dep. at 130.) Throughout his career, Dr. Herrin has trained thousands of people with regard to the entire ergonomics process. (Herrin Dep. at 131.) Dr. Herrin acknowledges that he has never conducted a peer-reviewed study investigating the hypothesized relationship between occupational hand use and cumulative trauma disorders (CTDs). (Herrin Dep. at 85, 96, 100.)

In preparing his report and testimony for this litigation, Dr. Herrin read various depositions, including Stasior's; conducted a personal interview with Stasior; visited Stasior's work station on January 23, 1997; read Amtrak's safety rules; reviewed Stasior's medical records; and reviewed various articles from ergonomic literature. (Herrin Report; Herrin Dep. at 7, 13, 14–15, 22.) Dr. Herrin read between 50–100 articles from the ergonomic literature, as well as a book entitled *Work Related Musculoskeletal Disorders.* (Herrin Dep. at 10, 18–20, 69–70.) Dr. Herrin's method for selecting these articles consisted of performing a word search on four computer databases for all articles whose abstracts or titles contained the words "office ergonomics." (Herrin Dep. at 19 .) Dr. Herrin opines that Stasior's CTS and chronic tendonitis were caused by essentially three occupational risk factors which he observed while visiting Chicago's Amtrak facility in January 1997.

The first risk factor cited by Dr. Herrin is awkward "wrist posture." Dr. Herrin ob-

serves that Stasior could not touch the floor with her feet while working even when her chair was adjusted to the lowest possible position. (Herrin Dep. at 40.) According to Dr. Herrin, because Stasior adjusted her chair to the lowest possible position, and because the keyboard was positioned on the work table, Stasior had to raise her arms in order to reach the keyboard. Dr. Herrin documents these observations by providing measurements of Stasior's chair, work table, and Stasior herself. (Herrin Report at 3.) Dr. Herrin concludes that the configuration of Stasior's work station caused her to suffer wrist-flexion and wrist tension while she keyed. (Herrin Dep. at 8–9, Herrin Report at 3–4.) Dr. Herrin concedes that he does not know the percentage of time during which Stasior's wrists were in an awkward posture because Dr. Herrin spent a total of 20 minutes observing Stasior at her workstation. (Herrin Dep. at 193.) Dr. Herrin also concedes that he did not quantify the extent of the "awkward posture" risk factor. (Herrin Dep. at 208.)

The second risk factor cited by Dr. Herrin is "repeated and sustained hand exertions." Dr. Herrin states in his report that Stasior spent 7.5 hours per day keyboarding, and that this exposure time, combined with Amtrak's productivity standard of 92% talk-time, created the most commonly-recognized risk factor in office work. (Herrin Report at 4.) Dr. Herrin cites an epidemiological study by Dr. Laura Punnett, which he states "provides a nice summary of recent research on this subject and supports the above opinion." (Herrin Rep. at 4.) In addition, Dr. Herrin states that "Ms. Stasior was not afforded sufficient rest periods to avoid development of cumulative trauma disorders." (Herrin Report at 4.)

However, testimony from Dr. Herrin's deposition demonstrates that his report is not entirely accurate in its analysis of "repeated and sustained hand exertions" at Stasior's work station. Dr. Herrin concedes in his deposition that his statement that "Stasior spends over 7.5 hours per day keyboarding," is inaccurate, and that Stasior actually keyboards roughly ten seconds per minute, which is a relatively low-frequency. (Herrin Dep. at 181.)[2] Moreover, Dr. Herrin acknowledges in his deposition that he did not perform any studies to determine whether decreasing the time she spent at the keyboard would have resulted in a similar decrease in her symptoms. (Herrin Dep. at 204–205.) Finally, Dr. Herrin concedes in his deposition that he has no idea what kind of rest periods Stasior was allowed to take in 1991 and before. (Herrin Dep. at 176–178.)

The third risk factor cited by Dr. Herrin is psychosocial pressure.[3] To support his statement that psychosocial factors contribute significantly to the development of musculoskeletal disorders in office work, Dr. Herrin attaches an article by Steve Sauter and Naomi Swanson describing the relevant research literature. (Herrin Report at 4.)

In addition to identifying the three risk factors cited above, Dr. Herrin states in his report that Amtrak "did not provide Ms. Stasior with adequate training on the occupational and personal risks associated with CTDs," and he concludes that such lack of training also contributed to Stasior's CTDs. (Herrin Report at 5.)

Dr. Herrin concedes at multiple points during his deposition that he did not test his hypothesis that awkward posture, repetition, and psychosocial pressures at Amtrak's RSO contributed to Stasior's CTS and chronic tendonitis. Dr. Herrin did not perform any kind of study to determine the number of reservation sales agents in Amtrak's Chicago RSO experiencing discomfort. (Herrin Dep. at 52–53, 199, 203–204.) In addition, Dr. Herrin concedes that he did not perform any type of statistical analysis of the frequency of CTS in a work force similar to Amtrak's Chicago RSO to test his hypothesis. (Herrin

2. Dr. Herrin also states in his deposition that Stasior's keyboarding as a reservation sales agent was very minimal and could be characterized as low-force. (Herrin Dep. at 48–49.)

3. Although Dr. Herrin does not say that he personally observed such psychosocial pressure while visiting Amtrak's Chicago facility, he states in his report that "Ms. Stasior mentioned that she has been forced to work under close supervision so her productivity can be carefully monitored." (Herrin Report at 4.)

Dep. at 205.) Dr. Herrin also stated that he does not intend to publish for peer-review his conclusion regarding causation in this case. (Herrin Dep. at 205.)

In addition to confirming that he did not validate any of his opinions through testing, Dr. Herrin implicitly concedes in his deposition that his methodology as to causation was "invalid." First, Dr. Herrin states that in order for a conclusion on causation to be valid, such a conclusion must rely on epidemiological studies. (Herrin Dep. at 74.) Dr. Herrin also concedes that one cannot render a conclusion regarding causation based on a single case study. (Herrin Dep. at 74.) Elsewhere in his deposition, Dr. Herrin concedes that he did not rely on epidemiology in formulating his opinion. (Herrin Dep. at 74, 189.) Moreover, despite having read between 50–100 articles from the ergonomics literature, Dr. Herrin cannot cite in his report or in his deposition any scientific or epidemiological studies showing that low-force, low-repetition occupations such as Stasior's are associated with CTDs. (Herrin Dep. at 184.)

In defense of Dr. Herrin's causation methodology, Stasior highlights other parts of Dr. Herrin's report and deposition testimony. Dr. Herrin states in his report that it is not possible to quantify the probability of developing CTS posed by any single risk factor because there are multiple factors which may contribute to the onset of this disorder. (Herrin Report at 2.) In his deposition, Dr. Herrin states that the "dose-response" level of risk factors[4] is unknown and basically unknowable. (Herrin Dep. at 100–01, 102, 108–109.) The court notes that Dr. Herrin does not cite any studies in support of this proposition. Dr. Herrin also states that when an ergonomist analyzes a workplace, the appropriate course of action is not to quantify risk factors, but rather to minimize those risk factors that exist. (Herrin Dep. at 125.)

In addition to testifying as to causation, Dr. Herrin also testifies as to foreseeability. In his report, Dr. Herrin states that "[t]he

risks of cumulative trauma disorders in office work have been recognized for over 10 years and Amtrak health and safety professionals should have known of appropriate abatement strategies." (Herrin Report at 5.) However, in his deposition testimony, Dr. Herrin acknowledges that he is unable to cite any studies from 1991 or before showing that the degree of posture, repetition and force at Amtrak's Chicago RSO was ergonomically unsafe. (Herrin Dep. at 184.)

### B. *Michael D. Shinnick, Ph.D.*

Dr. Shinnick has extensive experience in ergonomics. While Dr. Shinnick is primarily an ergonomist, he also has had training in industrial engineering. (Shinnick Dep. at 39.) In his current position as Director of the Dynamics Research Group, Dr. Shinnick analyzes the ergonomics of office and production environments. (CV of Michael Shinnick, attached to Pl's. Response to Defendant's Motion for Summary Judgment as Exhibit 3, 1–2 ("CV of Michael Shinnick").) In one of his graduate training programs, Dr. Shinnick studied ergonomics techniques and industrial engineering in Australia, and upon his return, fulfilled the program's objective by disseminating the knowledge he had gained through publications and university teaching. (Shinnick Dep. at 39–40.) Dr. Shinnick has also performed ergonomic analyses for Ford Motor Company and the United Automobile Workers. His specific functions included identifying ergonomic hazards and designing potential remedies. (Shinnick Dep. at 30–32.) Dr. Shinnick has been retained as an expert, and has testified, in other cases specifically involving CTS. (Shinnick Dep. at 55–56.) In these cases, Dr. Shinnick examined the work tasks for risk factors, and he examined companies' ergonomics programs and its procedures regarding training, reporting and medical surveillance. (Shinnick Dep. at 61.) He then rendered opinions related to exposure to risk factors and whether the employer had a proper program to remedy, warn or educate regarding that exposure. (Shinnick Dep. at 61–62.) In addition, Dr. Shinnick

---

**4.** The term "dose-response" refers to the specific level of a given risk factor that elicits a given disorder. (Herrin Report at 2 .)

says that he has "widely read" the literature on CTDs. (Shinnick Dep. at 76.) Dr. Shinnick acknowledges that he has never conducted any peer-reviewed studies investigating the hypothesized relationship between occupational hand use and CTDs. (Shinnick Dep. at 42–44.)

Amtrak accurately summarizes the opinions Dr. Shinnick provides in his report with respect to causation and foreseeability:

1. Plaintiff's workplace contributed to her development of carpal tunnel syndrome.

2. Repetition, awkward posture and lack of training were the risk factors for CTS which were present in Plaintiff's workplace; and

3. Defendant should have known that Plaintiff's job as a reservation sales agent exposed her to the risk of developing CTS, because literature in this area has existed for decades.

(Def.'s Shinnick Brief at 1.)

In preparing his testimony and report for this litigation, Dr. Shinnick reviewed Stasior's medical records; reviewed various depositions, including Stasior's; reviewed Amtrak's policies and procedures regarding ergonomics training, medical surveillance, and reporting; interviewed Stasior; performed functional capacity and grip strength tests on Stasior; and directly observed Stasior's workplace in 1997. (Shinnick Dep. at 10–11, 25, 28; Shinnick Report at 2–3.) Dr. Shinnick determined that Amtrak's Chicago RSO had two risk factors which contributed to Stasior's CTS and chronic tendonitis. These risk factors were improper posture and repetition, both amplified by a lack of education and training on the correct use of Amtrak's equipment. (Shinnick Dep. at 22.)

In support of his opinion that improper posture contributed to Stasior's CTS, Dr. Shinnick stated that Stasior had not been trained about wrist and seating position, seat elevation, and keeping her feet on a flat service. (Shinnick Dep. at 110.) According to Shinnick, it is generally accepted, and certainly accepted by the National Institute for Occupational Safety and Health ("NIOSH"), that awkward posture is a risk factor and that non-neutral wrist postures are a hazard. (Shinnick Dep. at 78–79.)

In support of his opinion that repetition contributed to Stasior's CTS, Dr. Shinnick stated that the preponderance of the ergonomics literature cites repetitive hand exertions as an occupational risk factor for developing CTDs. (Shinnick Dep. at 75–76.) However, Dr. Shinnick could not provide actual citations for specific treatises or articles in this regard. (Shinnick Dep. at 76.) Dr. Shinnick also stated the fact that Stasior used the keyboard with low frequency does not mean that repetition was not a risk factor. According to Dr. Shinnick, using the keyboard intermittently for approximately eight hours a day, five days a week, since 1977 could lead to cumulative trauma. (Shinnick Dep. at 37, 88–89, 111.)

The record demonstrates that Dr. Shinnick did not gather any quantitative data about Stasior's workstation to show that the risk factors of awkward posture and repetition were present at Amtrak's Chicago RSO. Dr. Shinnick personally visited Stasior's work site in 1997 for less than one hour. (Shinnick Dep. at 29.) While he was there, Dr. Shinnick did not take any measurements of the workstation that Stasior used in 1991 and before. (Shinnick Dep. at 27–28.) Dr. Shinnick did not determine the type or dimensions of the chair in which Stasior sat in 1991 and before. (Shinnick Dep. at 6–7, 27–28, 52, 122.) Dr. Shinnick did not determine the type or dimensions of the keyboard Stasior used in 1991 and before. (Shinnick Dep. at 19.) Moreover, Dr. Shinnick did not quantify any of Stasior's current work habits in order to extrapolate what her work habits might have been in 1991 and before. He made no attempt to quantify the frequency with which Stasior and other reservation sales agents keyboard at Amtrak's Chicago facility. Dr. Shinnick also did not attempt to quantify the force with which Stasior and other reservation sales agents type the keys on her keyboard in 1991 and before. (Shinnick Dep. at 17–20.) Dr. Shinnick did not measure the angle at which Stasior held her wrists when she keyboarded, nor did he quantify the length of time Stasior allegedly spent with

her wrists in a non-neutral position. (Shinnick Dep. at 95, 44–45.) Dr. Shinnick argues that it was not necessary for him to take measurements of Stasior's pre–1991 workstation or current work habits in order to conclude that awkward posture and repetition contributed to her CTS and chronic tendonitis. (Shinnick Dep. at 51–53, 44–45, 20–21.) Dr. Shinnick says he knows these risk factors were present because there was no evidence that Amtrak trained Stasior or any of her colleagues on ergonomic risk factors or techniques for adjusting their workstations. (Shinnick Dep. at 20–21 .) The court notes that Dr. Shinnick cites no authorities in support of this proposition.

Dr. Shinnick's report and deposition demonstrate that he did not subject his causation opinions to any testing. Dr. Shinnick did perform functional capacity and grip tests on Stasior in 1997, and he reviewed Dr. Herrin's report, which provides measurements of Stasior's pre–1991 work station. However, Dr. Shinnick does not cite any peer-reviewed epidemiological or scientific studies tying the results of his tests or Dr. Herrin's measurements to the conclusion that awkward posture and repetition contributed to Stasior's CTS. In explaining his causation analysis, Dr. Shinnick stated that any prudent employer does not care about quantifying a risk factor but rather about minimizing any risk factors that exist. (Shinnick Dep. at 99–100.)

In addition to forming an opinion on causation, Dr. Shinnick has also formed an opinion on foreseeability. In his report, Dr. Shinnick states that American employers generally have been aware of the risk factors for CTDs since the late 1970s, and that ergonomic programs were integrated into all levels of industry by the early 1980s. (Shinnick Report at 4.) Dr. Shinnick concludes that "Amtrak could have known and should have known that the duties routinely performed by Mrs. Stasior placed her in danger of developing cumulative trauma injuries." (Shinnick Report at 4.) However, in his deposition testimony, Dr. Herrin acknowledges that he is unable to cite any studies from 1991 or before showing that the degree of posture, repetition and force at Amtrak's Chicago RSO was ergonomically unsafe.

Amtrak now moves the court to bar Stasior's proffered expert testimony of Drs. Gary Herrin and Michael Shinnick under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In conjunction with these motions, Amtrak also moves the court to grant summary judgment on its behalf under Rule 56 of the Federal Rules of Civil Procedure.[5] Amtrak argues that Stasior offers no admissible evidence creating any genuine issues of material fact regarding her FELA claim.

### *Analysis*

Amtrak moves the court to grant summary judgment on its behalf under Rule 56 of the Federal Rules of Civil Procedure. The court will render summary judgment only if the factual record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Bratton v. Roadway Package Sys., Inc.,* 77 F.3d 168, 173 (7th Cir.1996) (quoting Fed.R.Civ.P. 56(c)). The court will not render summary judgment if "a reasonable jury could return a verdict for the nonmoving party." *Sullivan v. Cox,* 78 F.3d 322, 325 (7th Cir.1996) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In ruling on a motion for summary judgment, the court views the facts in the light most favorable to the nonmoving party. *Bratton,* 77 F.3d at 171; *Sullivan,* 78 F.3d at 325.

On a motion for summary judgment, the moving party "bears the initial burden of showing that no genuine issue of material fact exists." *Hudson Ins. Co. v. City of Chicago Heights,* 48 F.3d 234, 237 (7th Cir. 1995) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Then the burden shifts to the non-

5. Pursuant to Rule 12(N) of the Local General Rules for the Northern District of Illinois, Stasior filed a 12(N) statement in response to Amtrak's 12(M) statement, but she failed to file a formal additional statement of facts providing informa-

tion regarding the testimony of Dr. Herrin and Dr. Shinnick. On January 21, 1998, the court issued a minute order granting Stasior's motion for leave to file an amended 12(N) statement with a formal additional statement of facts.

moving party, which "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, NLFC, Inc. v. Devcom Mid–America, Inc.,* 45 F.3d 231, 234 (7th Cir.1995) (citations omitted), *cert. denied,* 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257.

■ Stasior brings her negligence suit against Amtrak under FELA. Under FELA, railroad companies are liable in damages to any employee who suffers injury due to the railroad's negligence. 45 U.S.C. S 51.[6] To recover under FELA, plaintiff must prove the common-law elements of negligence, including duty, breach, foreseeability and causation. However, the Seventh Circuit has held that "the quantum of evidence required to establish liability in a FELA case is much less than in an ordinary negligence action." *Harbin v. Burlington N. R.R. Co.,* 921 F.2d 129, 131 (7th Cir.1990); *see also Deutsch v. Burlington N.R.R. Co.,* 983 F.2d 741, 743 (7th Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). Under FELA, the plaintiff must provide a reasonable basis for a jury to conclude that the employer's negligence played any part, even the slightest, in producing the injury for which damages are sought. *Wilson v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 841 F.2d 1347, 1353 (7th Cir.), *cert. denied* (citing *Rogers v. Missouri Pac. R.R. Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)), 487 U.S. 1244, 109 S.Ct. 1, 101 L.Ed.2d 953 (1988). Discretion to engage in common sense inferences regarding issues of causation and fault is exclusively vested with the jury "in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury." *Walden v. Illinois Cent. Gulf R.R.,* 975 F.2d 361, 364 (7th Cir.1992) (citing *Rogers,* 352 U.S. at 510, 77 S.Ct. 443).

■ Therefore, the case must be submitted to the jury "when there is even slight evidence of negligence," *Harbin,* 921 F.2d at 131; *Deutsch,* 983 F.2d at 743, whether or not the evidence would also reasonably permit the jury to attribute the injury to other causes as well. *Wilson,* 841 F.2d at 1353. In the instant case, viewing the evidence in a light most favorably to Stasior, this court must inquire whether a jury may conclude from all the admissible evidence that negligence of Amtrak played a part in Stasior's injury. *Rogers v. Missouri Pac. R.R. Co.,* 352 U.S. 500, 506–07, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). It is important to note that despite FELA's lower standard of proof, a plaintiff still bears the burden of presenting evidence from which a jury could conclude a "probable" or "likely" causal relationship as opposed to merely a "possible" one. *Dukes v. Illinois Central Railroad Co.,* 934 F.Supp. 939, 944 (N.D.Ill.1996); *Edmonds v. Illinois Cent. Gulf R.R. Co.,* 910 F.2d 1284, 1288 (5th Cir.1990) ("plaintiff must show more than a possibility that a causal relation existed") (citing *Moody v. Maine Cent. R.R .,* 823 F.2d 693, 695 (1st Cir.1987)).

■ Under FELA, a railroad has a duty to provide employees: (1) a reasonably safe work place; (2) safe equipment; (3) proper training; and (4) suitable methods to perform the assigned work. *Dukes,* 934 F.Supp. at 945. Whether the duty has been breached is viewed from an objective standard of reasonableness. The standard is the degree of care a person of ordinary, reasonable prudence would observe under similar circumstances. The scope of the railroad's duty, however, is limited to hazards it could have foreseen. *Id.* at 945; *Gallose v. Long Island R.R. Co.,* 878 F.2d 80, 85 (2d Cir.1989).

Amtrak now moves the court to bar the expert testimony of Gary Herrin and Michael Shinnick under Rule 702 of the Federal Rules of Evidence and *Daubert.* Amtrak also moves the court to enter summary judgment on its behalf under Rule 56 of the Federal Rules of Civil Procedure on the grounds that Stasior cannot produce any admissible evidence to support her FELA claim. Thus, before the court can render judgment on Amtrak's Motion for Summary

---

**6.** In enacting the FELA, Congress provided that every railroad "shall be liable in damages to any person suffering injury while he is employed by such carrier ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of [the railroad], or by reason of any defect or insufficiency, due to his negligence ..." 45 U.S.C. § 51.

Judgment, the court first must decide whether Stasior's expert testimony is admissible under Rule 702 and *Daubert.* If the proposed expert testimony on an essential element of Stasior's claim is inadmissible and it is the only evidence in support of that element, then Stasior will have failed to present an issue of material fact as to that essential element of her claim and summary judgment on that claim will be appropriate. On the other hand, if any components of Stasior's expert testimony are admissible, then the court must decide whether such testimony creates any genuine issues of material fact regarding Stasior's FELA claim.

## I. ADMISSIBILITY OF STASIOR'S PROFFERED EXPERT TESTIMONY UNDER RULE 702 AND THE DAUBERT STANDARD

### A. Fed.R.Evid 702 and the Daubert Standard

■ Under Rule 104(a) of the Federal Rules of Evidence, "[p]reliminary questions concerning the qualification of a person to be a witness, . . . or the admissibility of evidence shall be determined by the court." Fed. R.Evid. 104(a); [7] *see also Bradley v. Brown,* 42 F.3d 434, 436 (7th Cir.1994) ("[i]t is well established that issues related to expert opinion testimony are matters of law to be determined by the trial judge") (citations omitted). The proponent of the proffered expert testimony, i.e. Stasior in the present case, bears the burden of establishing its admissibility by a preponderance of proof. *Bradley v. Brown,* 852 F.Supp. 690, 697 (N.D.Ind.), *aff'd.,* 42 F.3d 434 (7th Cir.1994) (citation omitted); *Dukes v. Illinois Central Railroad Co.,* 934 F.Supp. 939 (N.D.Ill.1996); *Schmaltz v. Norfolk and Western Ry. Co.,* 878 F.Supp. 1119, 1120 (N.D.Ill.1995)(citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1316 (9th Cir.1995) ("the party presenting the expert must show that the expert's findings are based on sound science . . .")).

In determining whether Stasior has met her burden in this case, the court is guided by Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert,* the Supreme Court held that the trial court must, under Rule 702, exercise "some degree of regulation of the subjects and theories about which an expert may testify." 509 U.S. at 589, 113 S.Ct. 2786. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702.

In construing this rule, the Supreme Court explained that "the adjective 'scientific' implies a grounding in the methods and procedures of science" and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. Accordingly, a trial judge faced with a proffer of expert scientific testimony

> must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id.* at 592–593, 113 S.Ct. 2786. The Seventh Circuit has interpreted *Daubert* to require a two-step inquiry, where both steps must be met before the testimony is admissible. *Daubert* first

> directs the district court to determine whether the expert's testimony pertains to scientific knowledge. This task requires

---

**7.** Rule 104(a) provides:

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall

be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges. Fed. R.Evid. 104(a).

that the district court consider whether the testimony has been subjected to the scientific method; it must rule out 'subjective belief or unsupported speculation.' Second, the district court must "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested scientific testimony must 'fit' the issue to which the expert is testifying."

*O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1106 (7th Cir.), *cert. denied,* 512 U.S. 1222, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994) (citing*Porter v. Whitehall Laboratories, Inc.,* 9 F.3d 607, 613, 616 (7th Cir. 1993)); *see also Deimer v. Cincinnati Sub–Zero Products, Inc.,* 58 F.3d 341, 344 (7th Cir.1995); *Dukes,* 934 F.Supp. at 947–948 (N.D.Ill.1996); *Schmaltz,* 878 F.Supp. at 1121.

*Daubert* sets forth four nonexhaustive guideposts to assist district courts in determining whether the proffered scientific expert testimony fairly can be characterized as "scientific knowledge" within the meaning of Rule 702.

The nonexclusive factors in *Daubert* are the following: "(1) whether the theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the theory in the scientific community." *Gruca v. Alpha Therapeutic Corp.,* 51 F.3d 638, 643 (7th Cir.1995); *Daubert,* 509 U.S. at 591–595, 113 S.Ct. 2786; *Porter,* 9 F.3d at 613; *Dukes,* 934 F.Supp. at 948.

Another relevant consideration is "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert,* 43 F.3d at 1317.

▮▮▮ The most important factor in the Daubert analysis is whether the proffered scientific theory can be and has been tested by the scientific method. *Bradley v. Brown,* 42 F.3d at 438; *Stanczyk v. Black & Decker, Inc.,* 836 F.Supp. 565, 567 (N.D.Ill.1993).

"Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified." *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786, (citation omitted). Accordingly, a scientific theory that is not supported by appropriate validation is not admissible under Rule 702. Id. at 590, 113 S.Ct. 2786. Courts must exclude "subjective belief or unsupported speculation." *Porter,* 9 F.3d at 614 (citing *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786.)

**B.** ***Admissibility of Dr. Gary Herrin's Testimony***

**1. Qualification of Dr. Herrin as an Expert**

▮▮▮ The first inquiry for this court under Rule 702 is whether Dr. Herrin is qualified as an expert by "knowledge, skill, experience, training, or education" to render an opinion regarding causation in this case. Fed. R.Evid. 702, Fed.R.Evid. 104(a). Given Dr. Herrin's educational training in industrial engineering and his extensive experience in ergonomics, the court finds that he is qualified as an expert to testify regarding the causal connection between occupational risk factors at Amtrak and Stasior's CTS.

Amtrak argues that testifying as to causation in this case goes far beyond Dr. Herrin's "knowledge, skill, experience, training or education" because Dr. Herrin has no medical training and because he has never conducted or published any studies investigating the hypothesized relationship between occupational hand-use and upper extremity disorders. (Def.'s Motion to Bar Testimony of Gary Herrin at 5–8 ("Def.'s Herrin Brief").)

The court rejects both of these arguments. First, while Dr. Herin's lack of medical training makes him unqualified to render an opinion regarding the connection between non-occupational factors and CTS, his expertise as an ergonomist makes him qualified to testify regarding the connection between occupational factors and CTS. Under FELA an employer is liable if its "negligence played any part, even the slightest, in producing the injury ... for which damages are sought." Thus, even if occupational risk factors constituted only one cause of Stasior's CTS, under

FELA Amtrak still would be liable if the court finds that Amtrak breached a duty. Second, the fact that Dr. Herrin has never conducted or published his own studies regarding the hypothesized relationship between occupational hand use and upper extremity disorders (Herrin Dep. at 60, 96, 100) does not preclude him from providing a causation opinion in this case that is reliable under *Daubert*. Because Dr. Herrin has extensive experience in consulting and training in the ergonomic process, he is qualified to identify occupational risk factors for developing CTS at Stasior's work station. Then, even though Dr. Herrin himself has never conducted a study regarding the hypothesized relationship between occupational hand use and upper extremity disorders, he is knowledgeable enough to review studies done by other ergonomists, apply this learning to Stasior's situation, and then render a conclusion as to causation. Thus, the court finds that Stasior has met her burden of showing that Dr. Herrin is qualified to testify as to the causal relationship between occupational risk factors at Amtrak and Stasior's CTS.

2. Applicability of *Daubert* to Dr. Herrin's Testimony

■ The next issue facing the court is whether to apply *Daubert* in evaluating the admissibility of Dr. Herrin's testimony under Rule 702. Rule 702 involves expert testimony about "scientific, technical, or other specialized knowledge." Fed.R.Evid. 702. Stasior argues that *Daubert* is inapplicable here because *Daubert* limits its discussion to "scientific" knowledge as opposed to "technical or other specialized knowledge." (Pl.'s Resp. to Def's Mot. to Bar Herrin's Test. at 7 ("Pl.'s Herrin Response")); *Daubert*, 509 U.S. at 590, n. 8, 113 S.Ct. 2786. According to Stasior, Dr. Herrin's opinions are not about scientific knowledge, but rather about the technical and specialized area of office ergonomics. (Pl.'s Herrin Response at 8, 12.) Therefore, argues Stasior, the court should evaluate the admissibility of Dr. Herrin's testimony under traditional, non-*Daubert* analysis. (Pl.'s Herrin Response at 9.)

The court disagrees. Because Dr. Herrin's opinions in fact relate to scientific

knowledge, the court holds that *Daubert* is the appropriate framework for evaluating the admissibility of his opinions under Rule 702. Stasior asserts that Dr. Herrin is an expert in ergonomics. Ergonomics is defined as "[t]he science relating to man and his work, embodying the anatomic, physiologic, psychologic, and mechanical principles affecting the efficient use of human energy." *Dorland's Illustrated Medical Dictionary*, 574 (W.B. Saunders Company, 28th ed.1994). The opinions offered by Dr. Herrin in his report can be tested through methods and procedures employed to validate scientific theories. While Stasior cites numerous cases in support of her contention that *Daubert* does not apply to Dr. Herrin's testimony, none of these cases involve professional ergonomists discussing the causal link between occupational risk factors and CTS. In fact, federal district courts have employed the *Daubert* framework in evaluating the admissibility of testimony from professional ergonomists regarding the causal link between occupational risk factors and CTS in FELA cases. *See Dukes v. Illinois Central Railroad Company*, 934 F.Supp. 939 (N.D.Ill.1996); *Zarecki v. National Railroad Passenger Corporation*, 914 F.Supp. 1566 (N.D.Ill.1996); *Magdaleno v. Burlington Northern Railroad Company*, No. Civ.A. 96–B–2530, 1998 WL 239300 (D.Colo. Mar.2, 1998); *Hopkins v. NCR Corporation*, Civ. A. No. 93–188–B–M2, 1994 WL 757510 (M.D.La. Nov.17, 1994), *aff'd*, 53 F.3d 1281 (5th Cir.1995); *Finley v. NCR Corporation*, 964 F.Supp. 882 (D.N.J. 1996); *Dennis v. Pertec Computer Corporation*, 927 F.Supp. 156 (D.N.J.1996), *aff'd*, 135 F.3d 764 (3rd Cir.1997); *Bennett v. PRC Public Sector, Inc.*, 931 F.Supp. 484 (S.D.Tex.1996); *Vice v. Northern Telecom, Inc.*, Civ. A. No. 94–1235, 1996 WL 200281 (E.D.La. April 23 1996); *Bowers v. Northern Telecom, Inc.*, 905 F.Supp. 1004 (N.D.Fla. 1995); *Schneck v. International Business Machines Corporation*, No. 92–4370(GEB), 1996 WL 885789 (D.N.J. June 25 1996).

3. **Application of *Daubert* to Dr. Herrin's Testimony**

■ The court now must determine whether Dr. Herrin's testimony is reliable and relevant under the *Daubert* test. Ac-

cording to *Daubert*, in order for expert testimony to be considered reliable, the proffered scientific theory must have been tested by the scientific method and subjected to peer review and publication. *Daubert*, 509 U.S. at 591–595, 113 S.Ct. 2786; *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 643 (7th Cir.1995); *Dukes*, 934 F.Supp. at 948.

In circumstances similar to those presented in the ·instant FELA case, other federal district courts have found the testimony of alleged experts regarding CTS to be unreliable under *Daubert*. *Dukes v. Illinois Central Railroad Company*, 934 F.Supp. 939 (N.D.Ill.1996); *Zarecki v. National Railroad Passenger Corporation*, 914 F.Supp. 1566 (N.D.Ill.1996); *Magdaleno v. Burlington Northern Railroad Company*, No. Civ.A. 96–B–2530, 1998 WL 239300 (D.Colo.1998).

In *Dukes*, the plaintiff filed a FELA claim alleging that his CTS developed because of his working conditions at a railroad company as a car inspector. *Dukes*, 934 F.Supp. at 942. The court concluded that the affidavit of the plaintiff's expert, Dr. Engelhard, a medical doctor, was unreliable under *Daubert* and thus could not be considered on the motion for summary judgment because "there [was] no evidence that his testimony [was] based on sound scientific methodology." *Id.* at 947. The court observed that Dr. Engelhard did not conduct an independent investigation or research into the causes of CTS in general. *Id.* at 947. Moreover, Dr. Engelhard failed to investigate specifically whether the plaintiff's task of carrying signal lights caused his CTS; and he failed to present any evidence as to the amount of pressure or repetition necessary to cause plaintiff's injuries. *Id.* at 947. In addition, Dr. Engelhard articulated no methodology or technique by which his conclusions could be scientifically tested or subject to peer review. *Id.* at 948. Finally, the court noted that Dr. Engelhard prepared his testimony specifically for litigation. *Id.* at 950.

In *Zarecki*, the plaintiff filed a FELA claim alleging that her CTS developed because of her working conditions at a railroad company as a reservation sales agent. *Zarecki*, 914 F.Supp. at 1573–74. The court concluded that an affidavit by the plaintiff's expert, Dr. Farrell (a medical doctor), was unreliable under *Daubert* and thus could not be considered on the motion for summary judgment because his opinion was not "based on any discernable scientific methodology." *Id.* at 1573–74.

In *Magdaleno*, the plaintiff filed a FELA claim alleging that he developed CTDs because of conditions present at a railroad's repair facility as a machinist. *Magdaleno*, 5 F.Supp.2d at 900. In support of his claim, the plaintiff proffered expert testimony of Dr. Konz, a professional ergonomist who set forth five opinions and two supplemental opinions. *Id.* at 900. Dr. Konz's first opinion was that "the risk factors for CTDs are repetition, joint deviation, force, and vibration." *Id.* at 901. Opinions 3, 4, 5 collectively stated that the plaintiff's working conditions caused his CTD. *Id.* 901. The court held that Dr. Konz's Opinion 1 passed the *Daubert* reliability test because "numerous epidemiologic studies have developed a correlation between these four factors and CTDs, including carpal tunnel syndrome (CTS)." *Id.* at 901. The court observed that these studies had attained general acceptance, had a known rate of error, and the theories they propounded had been tested for error. *Id.* at 902. However, the court held that Opinions 3, 4, 5 failed the *Daubert* reliability test because they were conclusory and unsupported by scientific evidence. *Id.* at 901. The court noted that Dr. Konz failed to conduct any study to determine the magnitude, duration, and frequency of the risk factors he cited. *Id.* at 901. Also, the court noted that the conclusions stated in Opinion 3 had not been tested nor subject to peer review and publication, and that the potential rate of error for Opinion 3 was quite significant. *Id.* at 905.

In addition to the FELA cases cited above, federal courts applying the *Daubert* test have found the testimony of alleged experts regarding CTS to be inadmissible in product liability actions regarding allegedly defective keyboards where the experts did not perform any tests or cite any studies showing that the keyboard at issue caused plaintiff's particular disorder. *Hopkins v. NCR Corporation*, 1994 WL 757510 (M.D.La. Nov.17, 1994), *aff'd.*, 53 F.3d 1281 (5th Cir.1995); *Finley v.*

NCR Corporation, 964 F.Supp. 882 (D.N.J. 1996); Dennis v. Pertec Computer Corporation, 927 F.Supp. 156 (D.N.J.1996), aff'd., 135 F.3d 764 (3rd Cir.1997); Bennett v. PRC Public Sector, Inc., 931 F.Supp. 484 (S.D.Tex.1996).

Stasior's case is analogous to all the cases cited above. Like many of the experts whose testimony was proffered in the above cases, Dr. Herrin identified certain characteristics of Stasior's workstation and cited studies showing that these characteristics constituted risk factors for developing CTDs. However, Dr. Herrin did not conduct any tests or cite any scientific or epidemiological studies to ascertain whether these risk factors actually caused Stasior's CTS and chronic tendonitis.

Dr. Herrin did not thoroughly and accurately quantify the degree of awkward posture and repetition which Stasior's allegedly suffered in 1991 and before. (Herrin Dep. at 193, 208, 181.) More significantly, Dr. Herrin explicitly said in his deposition that he did not test, nor does he intend to publish for peer-review, his hypothesis that awkward posture and repetition at Amtrak's Chicago RSO contributed to Stasior's CTS and chronic tendonitis.[8] Dr. Herrin has not determined what degree of wrist flexion or what amount of repetition in Stasior's workstation is considered safe or excessive relative to causing or preventing CTS injuries. There were no tests performed by Dr. Herrin to show that an individual using a work station requiring less wrist flexion and less reptition are likely to get CTS. (Herrin Dep. at 52–53, 199, 203–204, 205.) While Dr. Herrin cites an epidemiological study by Dr. Punnett in support of his opinion that "repeated and sustained hand exertions" contributed to

Stasior's CTS, Dr. Herrin fails to explicitly tie Dr. Punnett's study to the facts of Stasior's particular situation. In fact, Dr. Herrin concedes that even though epidemiological analysis is necessary in order to form a valid conclusion on causation in this case, he himself did not rely on any epidemiological studies in formulating his opinion. (Herrin Dep. at 74, 189.)

Dr. Herrin states in his deposition that Stasior's job as a reservation sales agent is low force-low repetition, yet he cannot cite any scientific or epidemiological studies showing that low-force, low-repetition occupations are associated with CTDs. In fact, one of the epidemiological studies which Dr. Herrin cites in his report states that low-force, low-repetition occupations are not associated with CTDs and that awkward posture is not a significant predictor of CTDs. Silverstein, et. al. "Occupational Factors and Carpal Tunnel Syndrome." American Journal of Industrial Medicine, 11:343–358 (1987). Essentially, Dr. Herrin's methodology consisted of identifying risk factors at Amtrak's Chicago RSO and concluding that these risk factors caused Stasior's CTS. Stasior has not presented this court with any evidence that Dr. Herrin's hypotheses regarding awkward posture and repetition were reviewed, or are accepted by his peers.[9] Because Dr. Herrin's theory and methodology were not tested nor subject to peer review, it is clearly impossible to determine the "known or potential rate of error" of his conclusions. The court also notes that Dr. Herrin did not base his proffered testimony on research he conducted independent of this litigation, but rather formulated his opinion

---

**8.** The court does not address Dr. Herrin's methodology as to "psychosocial pressures" since the case law clearly states that ordinary workplace stress is not actionable under FELA. Consolidated Rail Corporation v. Gottshall; Consolidated Rail Corporation v. Carlisle, 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994)(railroad worker who suffered nervous breakdown allegedly due to stressful working environment could not recover from railroad under FELA for negligent infliction of emotional distreess; there was no common-law basis for recognizing right to recovery on those facts); Capriotti v. Consolidated Rail Corporation, 878 F.Supp. 429

(N.D.N.Y.1995)(railroad employee could not recover from railroad under FELA for exacerbation of heart condition allegedly caused by job-related stress); Keith v. Consolidated Rail Corporation, 967 F.Supp. 948 (E.D.Mich.1996)(assuming that job stress caused railroad employee's heart attack, such stress-related injury was not compensable under FELA).

**9.** The fact that Dr. Shinnick accepts Dr. Herrin's hypotheses is irrelevant because Dr. Shinnick's testimony also does not satisfy Daubert's reliability test.

expressly for the purpose of testifying. (Herrin Dep. at 85, 96, 100 .)

The court acknowledges Dr. Herrin's observation that it is not possible to quantify the probability of developing CTS posed by any single risk factor because there are multiple factors which may contribute to the onset of this disorder. (Herrin Report at 2.) However, Dr. Herrin himself stated that in order for an opinion regarding causation to be valid, it must be supported by epidemiological studies. At least one of the epidemiological studies cited by Dr. Herrin categorizes jobs into different groups based on a quantitative analysis of the CTD risk factors present in each job. Silverstein et. al. *Occupational Factors and Carpal Tunnel Syndrome.* 11 American Journal of Industrial Medicine 343 (1987). Thus, while specific dose-response levels might be impossible to estimate, the court still finds that the causation for an individual's damages and the degree of various risks different workstations might possess can be measured, tested, and analyzed. Dr. Herrin did not adequately quantify the risk factors present at Stasior's work station and tie this information with the relevant epidemiological studies.

The court also acknowledges Dr. Herrin's argument that risk factors do not need to be quantified; if they are present in any amount, they should be addressed. (Herrin Dep. at 125; Shinnick Dep. at 21, 86–87, 99–100.) The court notes that this is a sensible assumption for an ergonomist whose goal is to identify any risk factors for CTDs in a work environment and reduce these risk factors so as to minimize any possibility of developing CTDs. However, the work of planning prospectively is materially different from the analysis required to ascertain specific causes of injuries that have already occurred. *Bennett,* 931 F.Supp. at 493. Particularly when allocation of legal and possibly substantial financial responsibility is in issue, there must be close adherence to scientifically reliable methodologies. *Id.* at 493–494.

Dr. Herrin did not adhere to the scientific method in proffering his causation opinions.

Finally, the court acknowledges that two federal district courts applying *Daubert* in products liability cases regarding keyboards have held that "the lack of definitive epidemiological testing [on the issue of causation] does not render expert testimony inadmissible." *Vice v. Northern Telecom, Inc.,* Civ. A. No. 94–1235, 1996 WL 200281 (E.D.La. April 23, 1996); *Bowers v. Northern Telecom, Inc.,* 905 F.Supp. 1004 (N.D.Fla.1995); *see also Schneck v. International Business Machines Corporation,* No. 92–4370(GEB), 1996 WL 885789 (D.N.J. June 25, 1996).

In *Vice,* the plaintiff alleged that a defect in a keyboard manufactured by the defendant caused her Repetitive Strain Injury ("RSI") *Vice,* 1996 WL 200281 at *1. To support her claim, the plaintiff proffered expert testimony from a physician, Dr. Pascarelli, and a professional ergonomist, Dr. Punnett. *Id.* at *6. The court found that while Dr. Pascarelli's opinion was not based on definitive epidemiological data establishing a specific exposure-response relationship between keyboard use and repetitive stress disorders, his testimony was still reliable under *Daubert. Id.* at *7. The court noted that Dr. Pascarelli's opinion was supported by a substantial body of scientific literature finding a strong association between RSI on the one hand, and repetitiveness and forcefulness of manual work, as well as the use of keyboards, on the other hand. *Id.* at *7. Moreover, the court found that Dr. Punnett's testimony was reliable under *Daubert* where Dr. Punnett based her testimony upon her analysis of the data yielded in 20 peer-reviewed or government cross-sectional studies examining the relationship between upper extremity disorders and video display terminals. *Id.* at *7. Although many of these studies did not even measure those factors which increase the risk of RSI, the court held that Dr. Punnett was qualified to extrapolate from these studies of factory workers and apply this learning to other manual tasks, such as keyboard operation. *Id.* at *8.[10]

10. *See also Bowers v. Northern Telecom, Inc.,* 905 F.Supp. 1004 (N.D.Fla.1995)(plaintiffs' expert testimony was held reliable under *Daubert* where one expert cited numerous scientific articles as-

sociating CTS with many characteristics of the keyboard at issue, and where another expert relied on five epidemiological factors in determining causality.); *Schneck v. International Busi-*

The court finds that *Vice* and *Bowers* are distinguishable from Stasior's case on two levels. First, the expert opinions proffered in *Vice* and *Bowers* were fundamentally of a diferent nature from the opinions offered by Dr. Herrin. *Vice* and *Bowers* were products liability cases in which the expert witnesses provided opinions regarding general, not specific, causation. In contrast, Dr. Herrin opines that working conditions at Amtrak's Chicago RSO facility actually caused Stasior to develop CTS and chronic tendonitis. (Herrin Report at 4.) Given the nature of Stasior's claim and Dr. Herrin's opinions, Dr. Herrin must provide at least some empirical basis for his claim that Stasior's particular order was caused by the specific physical movements she made at the workstation provided by Amtrak. As a result, when applying the *Daubert* test, this court must subject Dr. Herrin's testimony to a reliability standard more demanding than the one used in *Vice* and *Bowers*.

Second, the court notes that the expert testimony proffered in *Vice* and *Bowers* was substantially more reliable than Dr. Herrin's testimony. Even though the expert testimony in *Vice* and *Bowers* lacked precise empirical confirmation, the courts accepted the testimony because the experts relied on a sufficient amount of scientific literature and epidemiological analysis to support their conclusions. In contrast, Dr. Herrin concedes that he did not employ any epidemiological analysis in reaching his conclusions. (Dr. Herrin Dep. at 74, 189.) While Dr. Herrin refers to 50–100 studies that he reviewed regarding the causal relationship between occupational risk factors and CTDs, he makes no attempt to explicitly apply this learning to Stasior's case in a way that can be tested or peer-reviewed. Even though Dr. Herrin cites a study by Dr. Punnett in support of his opinion that the repetitive nature of Stasior's job caused her to develop CTS, he fails to explain, even in general terms, the method he used to extrapolate

from Dr. Punnett's study to Stasior's situation.

Based on the analysis set forth above, the court holds that while Dr. Herrin is qualified as an expert to render an opinion regarding causation, his actual testimony is not reliable under *Daubert*.[11] The court finds that Dr. Herrin did not satisfy *Daubert*'s requirement of testing his proffered causation opinion by the scientific method. *Bradley*, supra, 42 F.3d at 438; *Stanczyk*, 836 F.Supp. at 567.

The court also holds that Dr. Herrin's opinion as to foreseeability is not reliable under *Daubert*. Dr. Herrin has failed to cite any studies from 1991 or before scientifically demonstrating that low-repetition, low-force conditions, such as those present at Stasior's workstation, are associated with CTS. (Herrin Dep. at 184.) Therefore, it would be unreasonable to expect Amtrak to have foreseen that the workstation it provided Stasior would have contributed to her CTS and chronic tendonitis.

Because Dr. Herrin's testimony is not reliable under *Daubert* and therefore inadmissible under Rule 702, the court grants Amtrak's Motion to Bar Testimony of Gary Herrin.

### C. Admissibility of Dr. Michael Shinnick's Testimony

#### 1. Qualification of Dr. Shinnick as an Expert

The court finds that Dr. Shinnick is qualified as an expert by virtue of his "knowledge, skill, experience, training, or education" to render opinions regarding causation and foreseeability in this case. Fed. R.Evid. 702. Dr. Shinnick has extensive experience in analyzing the ergonomics of office environments, and he has read much of the literature on CTDs. (CV of Michael Shinnick; Shinnick Dep. at 39, 76.)

*ness Machines Corporation*, No. 92–4370(GEB), 1996 WL 885789 (D.N.J. June 25, 1996)(Dr. Punnett's opinion that defendant's keyboard can cause CTS was held reliable under *Daubert* where Dr. Punnett reviewed 20 epidemiological studies and applied this learning to the case at hand).

11. Because the court finds that Dr. Herrin's testimony is not reliable under *Daubert,* the court does not address whether Dr. Herrin's testimony satisies *Daubert*'s relevance requirement.

Amtrak argues that Dr. Shinnick is unqualified to offer opinions regarding causation because he has no medical training and because he has never conducted a study analyzing the hypothesized relationship between an occupation and CTS, or between a particular job and a worker's development of CTS. (Def.'s Brief in Support of Motion to Bar Testimony of Dr. Shinnick at 6–10 ("Def.'s Shinnick Brief").) Based on the analysis set forth in regard to Dr. Herrin's qualifications, the court dismisses Amtrak's arguments. The fact that Dr. Shinnick does not have medical training does not preclude him from rendering an opinion regarding the alleged occupational causes of Stasior's CTS. In addition, while Dr. Shinnick himself has never conducted any studies investigating the hypothesized relationship between occupations and CTS, the court finds that his extensive experience in ergonomics qualifies him to evaluate the studies done by other ergonomists and epidemiologists and to apply this learning to Stasior's case. Therefore, the court holds that Stasior has met her burden of showing that Dr. Shinnick is qualified to testify as to the casual relationship between occupational risk factors at Amtrak and Stasior's CTS.

### 2. Application of *Daubert* to Dr. Shinnick's Testimony

For the reasons set forth in regard to Dr. Herrin's testimony, the court holds that *Daubert* is applicable to the determination of the admissibility of Dr. Shinnick's testimony under Rule 702. Thus, the court will apply *Daubert* to this testimony.

■■■ The court holds that while Dr. Shinnick is qualified as an expert to render an opinion regarding causation, his actual testimony is not reliable under *Daubert* because he has not subjected his opinions to the scientific method.[12] Essentially, Dr. Shinnick "identified" the existence of risk factors and then concluded that these risk factors contributed to Stasior's CTS without performing any scientific tests or comparing the data he collected to scientific or epidemiological studies conducted by other ergonomists.

Dr. Shinnick never observed the workstation Stasior used in 1991 and before, and he made no attempt to measure the awkward posture and repetition which are allegedly present at Stasior's current workstation in order to extrapolate what her pre–1991 conditions were like. (Shinnick Dep. 27–29, 17–20, 99, 44–45.) Dr. Shinnick simply assumes, without citing any corroborating authority, that because Stasior allegedly was not trained in the proper use of her equipment, the risk factors of awkward posture and repetition must have been present at Stasior's workstation in 1991 and before. (Shinnick Dep. at 21.) While Dr. Shinnick performed functional capacity and grip tests on Stasior, he does not cite any peer-reviewed scientific or epidemiological studies tying the results of his tests to the conclusion that awkward posture and repetition contributed to Stasior's CTS and tendonitis. The court also notes that Dr. Herrin did not base his proffered testimony on research he conducted independent of this litigation, but rather formulated his opinion expressly for the purpose of testifying. (Shinnick Dep. at 42–44.)

Dr. Shinnick defends his "methodology" by stating that any prudent employer does not care about quantifying a risk factor but rather about minimizing any risk factors that exist. (Shinnick Dep. at 99–100.) The court notes that this is a sensible assumption for an ergonomist whose job is to minimize the possibility of developing CTDs in a work environment. However, the analysis required to prospectively minimize the risk factors for CTDs is substantially different from the analysis required to determine specific causes of injuries that have already occurred. *Bennett*, 931 F.Supp. at 493. Because the allocation of legal and possibly substantial financial responsibility is at issue in this case, Dr. Shinnick must base his causation opinions on scientifically reliable methodologies. *Id.* at 493–494. Because Dr. Shinnick does not test his causation opinion in accordance with the scientific method, the court holds that his testimony is not reliable under *Daubert* and therefore is inadmissible.

**12.** Because the court finds that Dr. Shinnick's testimony is not reliable under *Daubert*, the court does not address whether Dr. Shinnick's testimony satisfies *Daubert*'s relevance requirement.

The court's holding here is in accordance with the case law discussed above. *See Dukes v. Illinois Central Railroad Co.*, 934 F.Supp. 939 (N.D.Ill.1996); *Zarecki v. National Railroad Passenger Corp.*, 914 F.Supp. 1566 (N.D.Ill.1996); *Magdaleno v. Burlington Northern Railroad Co.*, 5 F.Supp.2d 899 (D.Colo.1998); *Hopkins v. NCR Corp.*, 1994 WL 757510 (M.D.La. Nov.17, 1994), *aff'd.*, 53 F.3d 1281 (5th Cir. 1995); *Finley v. NCR Corp.*, 964 F.Supp. 882 (D.N.J.1996); *Dennis v. Pertec Computer Corp.*, 927 F.Supp. 156 (D.N.J.1996), *aff'd.* 135 F.3d 764 (3rd Cir.1997); *Bennett v. PRC Public Sector, Inc.*, 931 F.Supp. 484 (S.D.Texas 1996). Moreover, because Dr. Shinnick does not cite any specific epidemiological or scientific studies in support of his conclusion, the court holds that Dr. Shinnick's testimony is distinguishable from the expert testimony held reliable in *Vice v. Northern Telecom, Inc.*, 1996 WL 200281 (E.D.La. April 23, 1996); *Bowers v. Northern Telecom, Inc.*, 905 F.Supp. 1004 (N.D.Fla. 1995); and *Schneck*, 1996 WL 885789 (D.N.J. June 25, 1996).

██ The court also holds that Dr. Shinnick's opinion as to foreseeability is not reliable under *Daubert*. While Dr. Shinnick states "Amtrak could have known and should have known that the duties routinely performed by Mrs. Stasior placed her in danger of developing cumulative trauma injuries," (Shinnick Report at 4), he is unable to cite any studies from 1991 or before showing that the degree of posture, repetition and force at Amtrak's Chicago RSO was ergonomically unsafe. Therefore, it would be unreasonable to expect Amtrak to have foreseen that the workstation it provided Stasior would have contributed to her CTS and chronic tendonitis.

Because Dr. Shinnick's testimony is not reliable under *Daubert* and therefore inadmissible under Rule 702, the court grants Amtrak's Motion to Bar Testimony of Michael Shinnick.

## II. *Summary Judgment*

██ The final issue before the court is whether to grant Amtrak's motion for summary judgment. The court holds that Amtrak has met its initial burden of showing that no genuine issue of material fact exists. Amtrak has provided a report from professional ergonomist David Ridyard characterizing Stasior's working conditions as low force-low frequency and concluding that there were no potential CTS or other CTD risk factors at the Chicago Amtrak facility. (Ridyard Report at 6.) Amtrak also cites a scientific study which finds that while CTS is strongly associated with high force-high repetitive jobs and to a lesser extent with low force-high repetitive jobs and high force-low repetitive jobs, CTS is not associated at all with low force-low repetitive jobs. Furthermore, the study stated that often cited awkward postures are not found to be strong predictors of CTS. Barbara A. Silverstein, Ph.D., et al. *Occupational Factors and Carpal Tunnel Syndrome.* 11 American Journal of Industrial Medicine 343, 353 (1987).

██ Stasior, on the other hand, has not met her burden of showing that there is a genuine issue for trial. Stasior's FELA claim is extremely complicated and requires expert testimony to establish that working conditions at Amtrak's Chicago RSO facility caused Stasior's CTS and chronic tendonitis, and that Stasior's injuries were reasonably foreseeable. Expert testimony which is not admissible cannot create genuine issues of fact sufficient to preclude summary judgment. *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1337–40 (7th Cir.1989); *Dukes*, 934 F.Supp. at 946. Because the expert testimony proffered by Stasior is not admissible under *Daubert*, the court holds that Stasior has failed show that there exists a genuine issue of material fact regarding the causation and foreseeability elements of her FELA claim.

### Conclusion

For the foregoing reasons, the court grants Amtrak's Motions to Bar the Testimony of Gary Herrin and Michael Shinnick; accordingly, the court grants Amtrak's Motion for Summary Judgment.